BYBEE, Circuit Judge:
In 2005, US Airways merged with America West Airlines, setting their respective pilots on a collision course over a single, integrated seniority list. At the time of the merger, the US Airways pilots (“East Pilots”) and the America West pilots (‘West Pilots”) were both represented by the Air Line Pilots Association (“ALPA”) as they attempted to negotiate a *971 seniority list. The East Pilots advocated a list based on “date of hire,” while the West Pilots advocated a list based on the strength of their pre-merger airline. When these negotiations failed, the dispute went to binding arbitration. The arbitration panel ordered a single list that did not fully accede to the wishes of either group. Unhappy with the result, the more numerous East Pilots forced the decertification of ALPA and the creation of a new union, the US Airline Pilots Association (“USA-PA”), that was expressly opposed to the enforcement of the arbitrator’s award and openly committed to a seniority list based on date of hire, which favored the East Pilots.
This is the second time a dispute over the seniority list has come before us. In the prior case, the West Pilots sued USA-PA for a breach of the duty of fair representation. Following both a jury and a bench trial, the district court found a breach and ordered USAPA to negotiate a collective bargaining agreement with US Airways based on the arbitrator’s award. In Addington v. U.S. Airline Pilots Ass’n (Addington I), 606 F.3d 1174, 1184 (9th Cir.2010), we dismissed the West Pilots’ duty of fair representation claim as unripe. Five years later, as US Airways completes its merger with American Airlines and their respective pilots — including US Airways’ feuding East and West groups— attempt to negotiate a single integrated seniority list, the West Pilots’ claim is now ripe for decision. The district court, in a decision it found “hard” and “a very close call,” concluded that USAPA did not violate its duty of fair representation to the West Pilots. We reverse.
I. BACKGROUND
The history of what we have called “a bitter seniority dispute,” Addington I, 606 F.3d at 1176, is a detailed one, and one that we will set forth with some care.
A. 2005 US Airways-America West Merger
1. The Merger and the Negotiations
The dispute between USAPA and the West Pilots arose when America West Airlines and US Airways merged to form a single airline carrier called US Airways. After the formal merger was completed in May 2005, the difficult process of combining day-to-day operations began. At that time, a single collective bargaining representative, ALPA, represented both the East and West Pilots. In September 2005, ALPA and the merging airlines entered into a Transition Agreement that set forth the process for achieving operational integration of the two airlines, including issues of pilot seniority relevant here.
Prior to the merger, the East and West Pilots each had their own separate seniority list and collective bargaining agreement. The Transition Agreement provided for the integration of the seniority lists in accordance with ALPA’s Merger Policy, which required the two pilot groups to negotiate an integrated list and, if negotiation failed, to submit to binding arbitration. The Merger Policy stated that any award issued by an arbitration board “shall be final and binding on all parties to the arbitration and shall be defended by ALPA.” In either event, the Policy bound the parties to reach a “fair and equitable agreement,” keeping in mind five goals: (1) preserving jobs; (2) avoiding windfalls to either group of pilots at the expense of the other; (3) maintaining or improving pilots’ pre-merger pay and standard of living; (4) maintaining or improving pilots’ pre-merger status; and (5) minimizing detrimental changes to pilots’ career expectations. Once the two sides arrived at an integrated list, the Transition Agreement provided that the list would be submitted to the airline for acceptance, at which point ALPA agreed to “use all reasonable means *972 at its disposal to compel the company to accept and implement the merged seniority list.”
The Transition Agreement also provided a timeline for implementing the single seniority list. Specifically, the Agreement stated that the seniority list would be implemented when three things occurred: (1) US Airways obtained a single operating certifícate (this occurred in 2007); (2) the two pilot groups created a single seniority list in accordance with the process set forth above; and (3) the pilots and the new airline negotiated a “Single Agreement”— a new collective bargaining agreement— applicable to all pilots. Until that happened, the existing seniority lists and collective bargaining agreements for the respective sets of pilots would remain in place.
Finally, the parties agreed that the Transition Agreement could be modified by written agreement between ALPA and the airline.
Consistent with the procedures set forth in the Transition Agreement, two merger committees — one representing the East Pilots, and one representing the West— entered into negotiations over an integrated seniority, list. Several factors complicated the negotiations. The East Pilots were a substantially larger group, consisting of about 5,100 pilots, as compared with 1,900 West Pilots. America West, however, was a newer and financially stronger airline; although its pilots generally had a later hire date, they also enjoyed better wages and greater job security. Most significantly, some 1,700 East Pilots (about one-third of all East Pilots) were on furlough at the time of the merger, while no West Pilots were on furlough. The negotiations, including mediation, failed to generate consensus over a single list, so pursuant to ALPA’s Merger Policy, the parties proceeded to binding arbitration.
2. The Nicolau Arbitration
An arbitration panel, led by George Ni-colau, held hearings over the course of eighteen days, from December 2006 to February 2007. In all, the arbitration record included testimony from 20 witnesses, 14 volumes of exhibits, and more than 3,000 pages of hearing transcript. In the arbitration, the East Pilots advocated for a seniority list ordered by date of hire, adjusted for length of service, which ended up pushing most of the West Pilots far down the seniority list and placing a number of furloughed East Pilots above active West Pilots. The West Pilots, on the other hand, advocated for a list based on pilot rank and career prospects, which gave comparatively less weight to length of service.
In May 2007, the arbitration panel issued a careful, 35-page decision known as the “Nicolau Award.” The panel, noting that the pilots’ respective proposals “differed dramatically,” observed that, in such mergers, “[i]t is understandable that universal acceptance is never achieved.” The arbitration panel adopted neither proposal in full, instead crafting its award using aspects of both proposals. The Nicolau Award placed about 500 senior East Pilots at the top of the seniority list, explaining that the West Pilots were not operating the widebody international aircraft generally flown by the most senior East Pilots at the time of the merger. It also placed at the bottom of the list the 1,700 East Pilots who were furloughed at the time of the merger, explaining that “merging active pilots with furloughees, despite the length of service of some of the latter, is not at all fair or equitable under any of the stated criteria.” The Nicolau Award blended the remainder of the East Pilot list with the West Pilot list.
*973 3. Decertification of ALPA/Certification of USAPA
As the district court aptly observed, “[t]o say the East Pilots were not pleased [with the Nicolau Award] is an understatement.” As we described in Addington I, a majority of the East Pilots “strenuously objected” to the Nicolau Award and immediately set about finding ways to prevent its implementation. 606 F.3d at 1177-78. Initially, the East Pilots tried to convince ALPA to find a way to set aside the Award. When that failed, the East Pilots filed suit to set aside the Nicolau Award. ALPA continued to urge the East Pilots to “comply with its representational and legal obligations under the Constitution & Bylaws, ALPA Merger Policy, the Transition Agreement, and implementing resolutions of the Executive Council.” Finally, the East Pilots withdrew their representatives from the committee negotiating a Single Agreement with the airline, effectively bringing those discussions to a standstill.
ALPA subsequently presented the Nico-lau Award to the airline for acceptance, consistent with its obligation under the Transition Agreement to “use all reasonable means” to compel the airline to accept the arbitrated seniority list. US Airways accepted the Award a .few months later, in December 2007. Id. at 1178.
In the meantime, dissatisfied with ALPA’s commitment to the Nicolau Award and hoping to prevent the Award from ever going into effect, the East Pilots decided to leave ALPA and form a new union. They consulted lawyers, who cautioned them that “the language you use in setting up your new union ... can be used against you. You need to stress [t]he positives of the new union and not dwell on the award. Don’t give the other side a large body of evidence that the sole reason for the new union is to abrogate an arbitration, the Nicolau award.” The pilots and counsel sought a “roadmap ... based on the premise that a new bargaining agent can get around the award and make the Nicolau award moot.” Ultimately, the East Pilots created USAPA, which adopted a constitution committing it “[t]o maintain[ing] uniform principles of seniority based on date of hire and the perpetuation thereof.” In November 2007, the National Mediation Board certified a representation election between ALPA and USAPA. Predictably, because of the number of East Pilots, USAPA won the election and was certified as the collective bargaining representative for all pilots in April 2008.
In September 2008 — five months after certification and almost a year after the airline accepted the Nicolau Award — USA-PA presented a new seniority proposal to US Airways. This proposal ignored the Nicolau Award, instead ordering the pilots according to their date of hire. USAPA’s ordering system effectively forced the West Pilots to the bottom of the seniority list, leaving them vulnerable to any furloughs. USAPA made clear that it would never implement the Nicolau Award.
B. 2008 West Pilot Suit Against USAPA (Addington I)
That same month, the West Pilots sued in district court, alleging that USAPA had breached its duty of fair representation by proposing a new seniority list instead of pursuing the implementation of the Nico-lau Award. After a trial, a jury found that “USAPA had breached its duty by abandoning an arbitrated seniority list in favor of a date-of-hire list solely to benefit one group of pilots at the expense of another.” Addington v. U.S. Airline Pilots Ass’n, No. CV 08-1633, 2009 WL 2169164, at *1 (D.Ariz. July 17, 2009) (unpublished). The district court then held a bench trial on the remaining equitable issues.
*974 The court found that “USAPA’s sole objective in adopting and presenting its seniority proposal to the Airline was to benefit the East Pilots at the expense of the West Pilots, rather than to benefit the bargaining unit as a whole.” Id. at *6. It reached this conclusion by determining that the terms of the Nicolau Award were final and binding, and thus any amendment USAPA wished to make to that Award required a legitimate union purpose. Id. at *10. The court rejected, one by one, each of USAPA’s asserted objectives. Among other things, it found no merit to USAPA’s claim that a different seniority proposal was necessary to break through the East Pilots’ impasse and ratify a new collective bargaining agreement, stating that “any asserted impasse was a pretext for bare favoritism of the East Pilots,” and that even if an impasse did exist, “it [was] one that USAPA goaded on” when it “misled the majority about its power to improve their seniority prospects at the expense of the West Pilots.” Id. at *17-18.
Having found no legitimate union purpose for USAPA’s actions, the court entered judgment for the West Pilots and issued an injunction ordering USAPA “to negotiate in good faith for the implementation of the Nicolau Award, defending that Award in negotiations and presenting it with the single new [collective bargaining agreement] to the pilots for ratification vote.” Id. at *28. It also ordered USAPA “to negotiate for the implementation of the Nicolau Award as part of any single [collective bargaining agreement], unmodified by additional conditions and restrictions USAPA would place upon it.” Id.
The East Pilots appealed. In Addington I, with one judge dissenting, we dismissed the case on ripeness grounds, concluding that the district court did not have jurisdiction to decide the case in the first instance. 606 F.3d at 1179. In so holding, we considered the “fitness of the issues for judicial decision,” and the “hardship to the parties of withholding court consideration.” Id. (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). We concluded that there were many contingencies that could yet “prevent effectuation of USAPA’s proposal and the accompanying injury” and that it was “speculative” whether the West Pilots would be harmed by the withholding of decision, because it was unclear whether a collective bargaining agreement implementing the Nicolau Award could be ratified. Id. at 1179-80. Observing that our judgment was consistent with our other duty of fair representation cases, “which have found DFR violations based on contract negotiation only after a contract has been agreed upon,” we remanded the case to the district court with directions to dismiss. Id. at 1181, 1184.
C. 2010 US Airways Declaratory Judgment Action
Shortly after we ordered dismissal of Addington I, US Airways filed a declaratory judgment action against the West Pilots and USAPA in district court, seeking guidance as to whether it could be held liable for assisting in a breach of USAPA’s duty of fair representation if it entered into a collective bargaining agreement that did not implement the Nicolau Award. In the same proceeding, USAPA sought summary judgment on its claim that its date-of-hire seniority proposal did not breach any duty of fair representation. Id. The district court made two rulings of note. First, the district court concluded that USAPA was “bound” by the Transition Agreement because USAPA succeeded “to the status of the former representative [ALPA] without alteration in the contract terms” when it became the pilots’ new collective bargaining representative. US Airways, Inc. v. Addington, No. CV 10- *975 01570, 2012 WL 5996936, at *4 (D.Ariz. Oct. 11, 2012) (quoting Int’l Bhd. of Teamsters v. Tex. Int’l Airlines, Inc., 717 F.2d 157, 163 (5th Cir.1983)) (unpublished). At the same time, however, the court noted that, pursuant to the Transition Agreement’s own terms, the Agreement “can be modified at any time by written agreement of [USAPA] and [US Airways].” Id. (internal quotation marks omitted).
Second, the district court warned USA-PA of the possible consequences of ignoring the Nicolau Award, and adverted that, “in negotiating for a particular seniority regime, USAPA must not breach its duty of fair representation”:
[I]f USAPA wishes to abandon the Nico-lau Award and accept the consequences of this course of action, it is free to do so. By discarding the result of a valid arbitration and negotiating for a different seniority regime, USAPA is running the risk that it will be sued by the disadvantaged pilots when the new collective bargaining agreement is finalized. An impartial arbitrator’s decision regarding an appropriate method of seniority integration is powerful evidence of a fair result. Discarding the Nicolau Award places USAPA on dangerous ground.
Id. Citing our decision in Addington I, the court rued that it could not “provide as much guidance as it had hoped it could” because the matter would not be ripe until there was a collective bargaining agreement. Id. at *5. Nevertheless, the court concluded that “[USAPA’s] seniority proposal does not breach its duty of fair representation provided it is supported by a legitimate union purpose,” and granted partial summary judgment in favor of USAPA. Id. No party appealed from that decision.
II. THE INSTANT LITIGATION
Having reviewed the relevant background, we turn to the proceedings that, underlie the present suit.
A. 2013 US Airways-American Airlines Merger and MOU
In April 2012, US Airways announced its intention to pursue a merger with American Airlines, following a decision by American Airlines’ parent company, AMR Corporation, to commence bankruptcy proceedings. Soon after, US Airways entered into discussions with the Allied Pilots Association (“APA”), the American Airlines pilots’ union, regarding labor contract terms. Although USAPA was not originally included in the negotiations, US Airways subsequently agreed to include USA-PA, which in turn tasked a Negotiating Advisory Committee with representing its pilots at negotiations. The Committee was comprised of four pilots: two East Pilots and two West Pilots.
Between late 2012 and early 2013, American Airlines, US Airways, USAPA, and APA negotiated a multi-party agreement called the “Memorandum of Understanding Regarding Contingent Collective Bargaining Agreement” (“MOU”). The MOU sets forth procedures for reaching a Merger Transition Agreement between APA and “New American Airlines,” the merged airline, in addition to a Joint Collective Bargaining Agreement to apply to all pilots employed by New American. Under the MOU, once the Merger Transition Agreement is fully implemented, it will “fully displace and render a nullity any prior collective bargaining agreements applicable to US Airways pilots and any status quo arising thereunder.”
The MOU also addresses a number of labor-related issues important to the pilots, including terms and conditions of pay, pension and retirement benefits, vacation time, and furlough guarantees. Both par *976 ties agree: that the MOU contains significant economic benefits for all US Airways pilots, including pay increases. With respect to seniority integration, the MOU provides under Paragraph 10(h):
US Airways agrees that neither this Memorandum nor the [Joint Collective Bargaining Agreement] shall provide a basis for changing the seniority lists currently in effect at US Airways other than through the process set forth in [the McCaskill-Bond Amendment].
This provision, which, did not appear in prior drafts of the MOU, was proposed by USAPA. It incorporates the 2007 McCas-kill-Bond Amendment, which sets forth a process by which merging airlines must integrate the seniority of their pilots. See 49 USC. § 42112 Note.[1]
The USAPA Board of Pilot Representatives voted to approve the MOU on January 4, 2013. Thereafter, the USAPA Negotiating Advisory Committee embarked on a series of roadshow presentations designed to inform its pilots about the MOU and urge their approval. USAPA, however, tailored its presentation to its divided audiences. When presenting the MOU to the West Pilots, the USAPA representative stated that the MOU was merely “neutral” with respect to seniority. However, when speaking to East Pilots, the representative said that the MOU was beneficial because, in effect, it confirmed that the Nicolau Award was “dead.” In a written statement to pilots, USAPA confirmed that under the MOU, the Nicolau Award was dead: “West pilots should not vote in favor of the MOU because they believe it will revive the Nicolau Award, and the East pilots should not vote against it because they are concerned it will cause the Nico-lau Award to be implemented.” Ultimately, a majority of voting pilots approved the MOU. Of the 1,041 West Pilots who voted, 1,017 voted in favor of the MOU. The MOU was ratified on February 8, 2013.
B. District Court Proceedings Below
In March 2013, shortly after the MOU was ratified, a group of West Pilots filed the present action on behalf of themselves and others similarly situated, bringing several claims against USAPA. In Claim One, the West Pilots alleged that USAPA had breached its duty of fair representation, asserting that “USAPA does not have a legitimate' union purpose to use anything other than the Nicolau Award list to integrate East Pilots and West Pilots.” Because the MOU “abandons a duty to treat the Nicolau Award as final and binding,” the West Pilots claimed, USAPA breached its duty of fair representation by entering into the MOU. As for a remedy, the West Pilots sought a declaratory judgment that “USAPA is continuing to violate the duty of fair representation by insisting that it will use a date-of-hire seniority list rather than the Nicolau Award list” and an injunction “requiring Defendants to conduct seniority integration according to the MOU procedures but using the seniority order in the Nicolau Award list to order the US Airways pilots.”[2]
*977 The district court certified a class of approximately 1,600 West Pilots, held a two-day bench trial in October 2013, and issued a decision in January 2014, in favor of USAPA. The court found that USAPA and its counsel, Pat Szymanski, were “motivated in large part simply by a desire to ensure that the Nicolau Award never take effect.” Addington v. U.S. Airline Pilots Ass’n, No. CV 13-00471, 2014 WL 321349, at *3 (D.Ariz. Jan. 10, 2014) (unpublished). The court observed that the text of Paragraph 10(h) of the final MOU was amended from USAPA’s original proposal, which read: “This MOU is not intended to nor shall it constitute the ‘Single Agreement’ referred to in Paragraph VI.A. of the September 23, 2005 Transition Agreement.” The court found that by including Paragraph 10(h), USAPA likely sought to abrogate any duty it had to implement the Nicolau Award: “While there is no definitive evidence why [Paragraph 10(h) ] was included, USAPA likely believed this provision was necessary because completion of a ‘Single Agreement’ would have triggered obligations under the Transition Agreement, including implementation of the Ni-colau Award.” Id. at *2. The court then found that, during its roadshow to inform pilots about the purpose and effect of the MOU, “USAPA undoubtedly played fast- and-loose with its members and changed its explanation of Paragraph 10(h) depending on its audience.” Id. at *7 n. 9. In general, the district court found, the West Pilots voted to ratify the MOU because they “accepted USAPA’s oral and written representations that the MOU was neutral.” Id. at *3.
As it had done in the 2012 action, the district court assumed that USAPA had an “existing obligation to use the Nicolau Award.” Id. at *6. The question, then, was whether USAPA had “some legitimate union purpose” for ignoring the Nicolau Award. Id. The court noted that, because no new seniority list had been agreed upon, it could not compare a new list with the list required by the Nicolau Award. In the end, the court concluded that the “increased compensation provisions” in the MOU suggested that “legitimate union objectives motivated some aspects of the MOU,” although it also found that “USA-PA’s actions are sufficiently disturbing to make this a very close call.” Id. at *5, 7. “The fact that USAPA might have, in truth, been motivated by a desire to weaken the chances of eventual adoption of the Nicolau Award is not enough.” Id. at *7. The court expressed hesitation about the West Pilots’ plea to examine Paragraph 10(h) in isolation, suggesting that such analysis “may inappropriately enmesh courts in the minutiae of collective bargaining.” Id. But the court put aside its reservation and went on to reason: “A rational person could conclude that making the MOU explicitly neutral [by including Paragraph 10(h)] served the legitimate union purpose of securing the additional compensation contained in the MOU while putting off to another day the question of the appropriate seniority regime.” Id. Moreover, the court stated, “USAPA could have rationally decided the neutral provision was necessary to prevent the drag-out fight that surely would have accompanied any non-neutral, seniority-related provision.” Id. at *7 n. 8.
The district court entered judgment in favor of USAPA on the duty of fair representation and separate representation claims and a judgment of dismissal without *978 prejudice on the West Pilots’ claim for attorneys’ fees.[3] Id. at *13. In so holding, the court observed that “USAPA avoided liability on the DFR claim by the slimmest of margins and the Court has serious doubts that USAPA will fairly and adequately represent all of its members while it remains a certified representative.” Id. at *12. It “stressed]” that it was not holding that USAPA was “free to ignore the Nicolau Award because its members will refuse to ratify anything other than a strict date-of-hire system.” Id. at *7. “In effect,” the court explained, “this is an argument that USAPA is free to treat the West Pilots poorly because that is what the majority of its members wish it to do. That is not the law.” Id. The district court admonished USAPA that it “cannot justify its actions by claiming it is merely acting as the conduit for enacting the East Pilots’ self-serving wishes.” Id.
C. Seniority List Integration Proceedings
While the parties were litigating their claims before the district court, the SLI proceedings forged ahead. The National Mediation Board certified APA as the exclusive collective bargaining representative for all pilots involved in the US Airways-American Airlines merger.[4] The merger and reorganization plan became effective on December 9, 2013, triggering the MOU’s provision mandating integration pursuant to the McCaskill-Bond Amendment. In accordance with the McCaskill-Bond process, the parties initially attempted to reach agreement through negotiations. When the parties did not reach a negotiated outcome by the agreed-upon deadline, they initiated preparations for ’arbitration pursuant to Section 13(b) of the Allegheny-Mohawk LPPs.[5]
As the parties proceeded.to arbitration, a dispute arose among USAPA, US Airways, American Airlines, and APA over whether APA possessed the authority to designate additional merger committees to participate in the SLI proceeding.[6] APA had agreed that USAPA could continue to participate in the SLI process even though it no longer constituted the bargaining *979 representative for all the pilots, but APA also wished to designate a separate committee to represent the West Pilots. USAPA disagreed, and, in February 2014, filed a declaratory judgment action seeking to prevent the West Pilots’ participation in the SLI process. APA counterclaimed, seeking a declaration that it had the discretion to establish a new merger committee if it so chose. The parties eventually agreed to a settlement, the terms of which are set forth in the Seniority Integration Protocol Agreement (“Protocol”).
Among other things, the Protocol established a Preliminary Arbitration Board to handle disputes regarding the SLI arbitration process. Pursuant to the Protocol, the dispute over whether APA has the authority to designate a separate merger committee for the West Pilots was referred to the Preliminary Arbitration Board. On January 9, 2015, the Preliminary Arbitration Board issued a final Award, concluding that “APA has the discretion to designate a West Pilots Merger Committee to participate in the [Seniority Integration List (SLI) process, and that it should do so.” In the Matter of the West Pilots’ Request for a Merger Committee, Preliminary Arbitration Board Award at 30 (Jan. 9, 2015). The Board explained that designating such a committee would be “consistent with [APA’s] duty of fair representation to all pilot employees,” because it would “ensure that the interests of all pilots will be properly represented during the SLI negotiations.” Id. at 32-33. The Board observed that, “[g]iven the history of intransigence and hostility between USAPA and the West Pilots,” in addition to USAPA’s constitutional commitment to date-of-hire principles, “it is far from clear that USAPA could or would adequately represent the interests of the West Pilots.” Id. at 33. Accordingly, the Board concluded that designating a West Pilot Merger Committee would be consistent with McCaskill-Bond’s requirement that the SLI process be “fair and equitable” and ordered APA to designate the West Pilot Merger Committee as a full participant in the seniority integration process. Id. at 34-35.
The West Pilots acknowledge that the Preliminary Arbitration Board Award granted them separate representation at the arbitration. Thus, the American Airlines Pilots Seniority Integration Committee, the USAPA Merger Committee, and the West Pilots’ Merger Committee are each set to participate in the upcoming SLI arbitration. The hearings are scheduled to begin on June 29, 2015, and conclude on October 16, 2015. The SLI Arbitration Board, which has already been selected, is expected to issue an award by December 9, 2015. The parties have agreed to allow a “reasonable extension,” if requested by the Board, in the event the Board is unable to meet that deadline. Absent an extension, however, an Award will issue 'on December 9, resulting in a single seniority list integrating the pilots of American Airlines, US Airways, and the former America West.
III. THE DUTY OF FAIR REPRESENTATION
With that background, we turn to the issue before us — whether USAPA violated its duty of fair representation to the West Pilots. We note at the outset that, of the many labor issues to which the duty of fair representation applies in the airline industry, pilot seniority is among the most im *980 portant and the most sensitive. Pilot seniority has been a fertile area for duty of fair representation claims. See, e.g., Air Line Pilots Ass’n v. O’Neill, 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Rakestraw v. United Airlines, Inc., 981 F.2d 1524 (7th Cir.1992); Bernard v. Air Line Pilots Ass’n, 873 F.2d 213 (9th Cir.1989); Jones v. Trans World Airlines, Inc., 495 F.2d 790 (2d Cir.1974). Seniority is immensely valuable to pilots; greater seniority means better wages and working conditions. A pilot’s position on a seniority list determines her rank, the aircraft she flies, and the control she maintains over her work schedule. Perhaps most important, a pilot’s seniority determines her degree of exposure to “furloughs,” or unpaid leaves of absence. The most junior pilots at an airline are often the first to be furloughed; seniority can therefore mean the difference between being in or out of a job. See Humphrey, 375 U.S. at 346-47, 84 S.Ct. 363. And the issue of seniority is a sensitive one for the union to traverse because a seniority dispute is the equivalent of a family feud over an inheritance: it is a zero-sum game, where moving one pilot up the list necessarily requires moving another pilot down.
It is no wonder, then, that this controversy between the West Pilots and USA-PA persists through two mergers, numerous negotiations, an arbitration, eight years of litigation, three district court decisions, and now, two decisions in our court. The lengthy and bitter history between the West Pilots and USAPA vividly illustrates the significance of this issue to the parties. Below, we first address the justiciability of the West Pilots’ claim before turning to the merits.
A. Justiciability
This case is ripe for review. Although we will discuss the duty of fair representation in greater detail in the next section, it is sufficient for us to note here that the duty “applies to all union activity, including contract negotiation.” O’Neill, 499 U.S. at 67, 111 S.Ct. 1127; see also Commc’ns Workers of Am. v. Beck, 487 U.S. 735, 743, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988) (the duty of fair representation applies to “challenges leveled not only at a union’s contract administration and enforcement efforts, but at its negotiation activities as well” (citation omitted)); Addington I, 606 F.3d at 1183 n. 8 (the duty “applies both to contract negotiation and contract administration”). The preliminary question is not whether “a union in its negotiating capacity” has a duty of fair representation to its members — it plainly does, O’Neill, 499 U.S. at 77, 111 S.Ct. 1127 — but rather, at what point can unfairly represented members complain to us? In Addington I, we concluded that it was when the fruit of negotiations is manifest and some kind of “ ‘final product’ has been reached.” 606 F.3d at 1182 (quoting O’Neill, 499 U.S. at 78, 111 S.Ct. 1127).
We believe that a sufficiently “final product” was reached in this case when USAPA negotiated the MOU in 2013 with American Airlines, US Airways, and APA. The MOU supplied a framework — the new ground rules — for entering into a comprehensive collective bargaining agreement for New American Airlines. Obviously, in the merger of American and US Airways, the question of pilot seniority will be a critical component of the efforts to merge the groups of pilots. However, the creation of an integrated seniority list in that merger is complicated by the fact that no single, integrated seniority list has ever emerged from the US Airways-America West merger. In a merger of two airlines, there are presently three seniority lists. That complication is where Paragraph 10(h) of the MOU comes in.
*981 Paragraph 10(h) relieves USAPA of any obligation it had to negotiate with the airlines and APA based on the Nicolau Award. By ensuring that the East and West Pilots’ seniority lists will remain separate, while at the samé time permitting the McCaskill-Bond seniority integration proceedings to go forward, Paragraph 10(h) effectively ensures that the Nicolau Award will never be implemented under the original US Airways-Ameriea West Transition Agreement and the ALPA Merger Policy to which USAPA succeeded. As USAPA reassured the East Pilots, with the adoption of Paragraph 10(h), the Nicolau Award was “dead.” Indeed, in its briefing to us, USAPA candidly concedes that it has successfully abrogated the Ni-colau Award, acknowledging that Paragraph 10(h) ensures that there will “never be a ‘[S]ingle [A]greement’ as referred to in the Transition Agreement.” If there can never be a “Single Agreement,” then USAPA will never face the prospect of being compelled, under the legal force of the Transition Agreement, to implement the Nicolau Award. Thus, USAPA’s abandonment of the Transition Agreement’s process for implementing the Nicolau Award is no longer speculative or contingent; it is a settled fact. The West Pilots’ duty of fair representation claim is thus fit for decision.
The second prong of our ripeness inquiry asks whether withholding judicial consideration also works a direct and immediate hardship on the parties. Addington I, 606 F.3d at 1179. We think that the answer to this question is also obvious. US Airways is a house divided. After ten years of negotiation, arbitration, and litigation, the US Airways pilots are poised to enter the SLI arbitration process without a single seniority list. Thus, not only must the West Pilots advocate for the seniority interests of US Airways pilots generally in the SLI proceedings, but they must also advocate the Nicolau Award vis-a-vis the date-of-hire seniority scheme that the East Pilots will present. This imposes a double hardship on the West Pilots that they would not otherwise have had to bear if USAPA had observed its duty of fair representation and made a good faith effort to implement the Nicolau Award. It is no answer to say that the SLI Board might, in its discretion, decide to use the Nicolau Award in its eventual integration of the US Airways and American Airlines pilots. Whether or not this possibility comes to pass, the West Pilots presently must endure the direct and immediate hardship of fighting on two fronts.
If the West Pilots are to have any relief, we must grant it before the SLI Award issues. The West Pilots have asked that the East and West Pilots be integrated in accordance with the Nicolau Award in the upcoming SLI proceedings. Their proposed injunction would effectively put the West Pilots in the position they would likely have occupied but for the breach: the US Airways pilots would enter the seniority integration process united behind a single seniority list integrated in accordance with the Nicolau Award. Plaintiffs have therefore alleged an actual “injury as a result of the putatively illegal conduct of the defendant.... that is likely to be redressed if the requested relief is granted.” Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 99-100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (citations omitted). Moreover, it is unclear whether the West Phots will have any remedy available once the East, West, and American pilots have been integrated pursuant to the SLI Award. The impending SLI Board decision makes it even more critical that we adjudicate this dispute now.[7]
*982 Plaintiffs’ duty of fair representation claim is ripe for adjudication, the requested remedy can ameliorate Plaintiffs’ claimed injury, and neither party argues otherwise. Plaintiffs have waited almost eight years for a resolution of their duty of fair representation claim on the merits. We will defer that resolution no longer.
B. The Duty of Fair Representation
We turn, therefore, to the merits of the West Pilots’ duty of fair representation claim. Whether a union’s conduct amounted to a’breach of its duty of fair representation presents a mixed question of law and fact that we review de novo. Woods v. Graphic Commc’ns, 925 F.2d 1195, 1199 (9th Cir.1991); Galindo v. Stoody Co., 793 F.2d 1502, 1513 (9th Cir.1986). We review a district court’s findings of fact for clear error. Woods, 925 F.2d at 1199; see Jones v. Union Pac. R.R. Co., 968 F.2d 937, 941-42 (9th Cir.1992). We conclude, for the reasons discussed below, that USAPA breached its duty of fair representation to the West Pilots.
1. USAPA has breached its duty of fair representation
At its most rudimentary level, the union’s duty - of fair representation is a duty “to make an honest effort to serve the interests of all, ... without hostility to any.” Ford Motor Co. v. Huffman, 345 U.S. 330, 337, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). The principle was first articulated in Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), a case with a troubled history not unlike the case before us. Bester Steele, the appellant in that case, was a fireman who worked for the Louisville & Nashville Railroad. 323 U.S. at 194, 65 S.Ct. 226. As a black man, Steele was excluded by “constitution and ritual” from the Brotherhood of Locomotive Firemen and Enginemen, the exclusive bargaining representative chosen by the white majority of firemen employed by the Railroad. Id. at 194-95, 65 S.Ct. 226. The Brotherhood notified the Railroad that it intended to amend the existing collective bargaining agreement “in such manner as ultimately to exclude all Negro firemen from the service.” Id. at 195, 65 S.Ct. 226. Under the amended agreement, Steele and several other black men were “disqualified” from their position in a “passenger pool,” a highly desirable assignment, then replaced by four white men — all junior in seniority to Steele and no more competent — and finally, assigned to “more arduous, longer, and less remunerative work in local freight service.” Id. at 196, 65 S.Ct. 226. Steele sued the Brotherhood under the Railway Labor Act — the act under which the Brotherhood’s authority as exclusive bargaining representative arose.
*983 The Supreme Court concluded that the Railway Labor Act imposes on the bargaining representative of a class of employees “the duty to exercise fairly the power conferred upon it [o]n behalf of all those for whom it acts, without hostile discrimination against them.” Id. at 203, 65 S.Ct. 226. The Court observed that the Act requires carriers to bargain exclusively with the representative chosen by the employees and no other, and that “[t]he minority members of a craft are thus deprived by the statute of the right, which they would otherwise possess, to choose a representative of their own.” Id. at 200, 65 S.Ct. 226. Thus, the Court reasoned, unless the union owes some duty to represent the minority members of the group, “the minority would be left with no means of protecting their interests.” Id. at 201, 65 S.Ct. 226. Accordingly, the Court held: “So long as a labor union assumes to act as the statutory representative of a craft, it cannot rightly refuse to perform the duty, which is inseparable from the power of representation conferred upon it, to represent the entire membership of the craft.” Id. at 204, 65 S.Ct. 226.
While Steele firmly established the nondiscrimination principle of the duty of fair representation, the precise contours of that duty are not clear. In other areas of the law where there is a general duty of nondiscrimination with respect to employment, such as equal protection or Title VII, we have well-developed tests and procedures for identifying unlawful discrimination. In those contexts, however, the duty runs to individuals, or classes of individuals sharing a common characteristic, such as race, gender, age, or disability. The duty of fair representation in the union context is quite distinct because of the collective nature of the union-employer relationship. A union must act in the general interest of its membership, and it may have to compromise on positions that will inevitably favor a majority of its members at the expense of other of its members. See Humphrey, 375 U.S. at 349-50, 84 S.Ct. 363 (“Conflict between employees represented by the same union is a recurring fact.”); Ford Motor Co., 345 U.S. at 338, 73 S.Ct. 681 (“The complete satisfaction of all who are represented is hardly to be expected.”); Rakestraw, 981 F.2d at 1580 (“Bargaining has winners and losers.”); Hendricks v. Airline Pilots Ass’n, 696 F.2d 673, 677-78 (9th Cir.1983). Such a winners-and-losers compromise does not mean that the union has violated its duty of fair representation.
The Court has struggled to describe the legal relationship between a union and its members. In Air Line Pilots Ass’n v. O’Neill, the Court observed that members of the Court have variously described the duty as analogous to a fiduciary duty that a trustee owes the trust beneficiaries, or the relationship between attorney and client, or the duty of care and loyalty owed shareholders by corporate officers and directors. 499 U.S. at 74-75, 111 S.Ct. 1127. In O’Neill itself, the Court resorted to the language of equal protection. Id. at 81, 111 S.Ct. 1127 (“A rational compromise ... was not invidious ‘discrimination’ of the kind prohibited by the duty of fair representation.”). The best statement of the duty appears in Vaca v. Sipes: “the exclusive agent’s statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.” 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Or, as we have expressed it, “[w]e may decline to give a union the deference owed to an exercise of judgment only where union actions or inactions are ‘so far outside a wide range *984 of reasonableness that [they are] wholly irrational or arbitrary.’ ” Beck v. United Food & Commercial Workers Union, 506 F.3d 874, 879 (9th Cir.2007) (second alteration in original) (quoting O’Neill, 499 U.S. at 78, 111 S.Ct. 1127). Accordingly, “[t]o establish that the union’s exercise of judgment was discriminatory, a plaintiff must adduce ‘substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives.’ ” Id. at 880 (quoting Amalgamated Ass’n of St., Elec. Ry. & Motor Coach Emps. v. Lockridge, 403 U.S. 274, 301, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971)).
The negotiation of seniority lists presents a particularly difficult application of the union’s duty of fair representation. For the reasons we have previously discussed, the creation of a seniority list is inevitably an exercise in winners and losers. We must respect the “wide latitude” that unions need for “the effective performance of their bargaining responsibilities.” O’Neill, 499 U.S. at 78, 111 S.Ct. 1127. Accordingly, obtaining employee benefits or minimizing risks to employees constitutes a legitimate purpose for making seniority-related concessions. See Baker v. Newspaper & Graphic Commc’ns Union, 628 F.2d 156, 166 (D.C.Cir.1980) (concluding that a union did not breach its duty of fair representation where it capitulated to the employer’s proposed seniority regime, necessary to keep the company afloat, concluding that “the loss of work for some ... [was] preferable to job losses for all”). Achieving stability and strengthening organized labor also constitute legitimate union purposes. See Rakestraw, 981 F.2d at 1534-35 (finding no breach where a union drafted the seniority roster to effectively punish pilots who had “crossed the picket lines” and thereby “strengthen the hand of organized labor in future conflicts with management”).
So, what constitutes such “arbitrary conduct” on the part of the union? For starters, we have made clear that the union’s duty to avoid “invidious” discrimination extends beyond such factors as “race or other constitutionally protected categories,” explaining that “these grounds are too restrictive.” Simo v. Union of Needletrades, 322 F.3d 602, 618-19 (9th Cir.2003). In the context of negotiating a seniority list, the prohibition on arbitrariness means that “a union may not juggle the seniority roster for no reason other than to advance one group of employees over another.” Rakestraw, 981 F.2d at 1535; see Ramey v. Dist. 141, 378 F.3d 269, 277 (2d Cir.2004) (upholding a finding of violation of the duty of fair representation where union stripped seniority from pilots who favored a different union). We have thus found that a union breached its duty of fair representation when it failed to follow its own policies in merging the seniority lists of two groups of airline pilots, the effect of which was to punish the pilots who were not unionized prior to the merger. Bernard, 873 F-2d at 217. Other courts have found a breach where the union assigned seniority based on longevity in the union, Teamsters Local Union No. 12 v. NLRB, 825 F.2d 608, 613 (1st Cir.1987); favored union members over nonunion members of the bargaining unit, Jones, 495 F.2d at 797; made seniority promises to advance the career of union officials, Barton Brands, Ltd. v. NLRB, 529 F.2d 793, 799 (7th Cir.1976); or made seniority promises to one group of employees to secure election, Truck Drivers, Local Union 568 v. NLRB, 379 F.2d 137, 143 (D.C.Cir.1967). In short, a union must act with some legitimate union purpose that “rationally promote[s] the aggregate welfare of employees in the bargaining unit.” Rakestraw, 981 F.2d at 1535 (emphasis added). Decisions benefitting a majority of the group may not be made merely *985 because the “losers ha[d] too few votes to affect the outcome of an intra-union election.” Id. at 1530.
Two cases analogous to ours illustrate these principles. The first of these is Barton Brands, Ltd. v. NLRB. In that case, Barton Brands acquired Glencoe Distilling Company. 529 F.2d at 795. The employees of both companies’ agreed to dovetail their seniority lists, and the union bargained for such a list with Barton. Id. at 795-96. When Barton did not build a new facility as planned, it was forced to lay off some of its employees. Id. at 796. The pre-acquisition Barton employees sought to “endtail” the former Glencoe employees, who they saw as taking positions from the pre-acquisition Barton employees. Id. During the collective bargaining agreement negotiations, the union and the employer agreed to recalculate the seniority of the former Glencoe employees and consider their seniority only from the date of acquisition; this had the effect of moving the Glencoe employees below all of the pre-acquisition Barton employees. Id. The Seventh Circuit found that the union violated its duty of fair representation to the former Glencoe employees:
[T]he Union acted solely on grounds of political expediency in reducing the former Glencoe employees’ seniority.... [S]uch decisions may not be made solely for the benefit of a stronger, more politically favored group over a minority group.
Id. at 798-99 (citation omitted). The court remanded to the NLRB to “consider that in order to be absolved of liability[,] the Union must show some objective justification for its conduct beyond that of placating the desires of the majority of the unit employees at the expense of the minority.” Id. at 800.
The second case is our decision in Bernard v. Air Line Pilots Ass’n. In that case, Alaska Airlines and Jet America Airlines were merging their operations. 873 F.2d at 214. The Alaska Airlines pilots were represented by ALPA; the Jet America pilots were not represented by a union. ALPA entered into negotiations with Alaska Airlines over integrating the Jet America and Alaska phots. Alaska Airlines refused to allow the Jet America pilots to participate in the negotiations. Id. at 215. When the airlines and ALPA entered into an agreement that favored the Alaska pilots, the Jet America pilots alleged that ALPA had violated its duty of fair representation. Id. at 214-15. We concluded that ALPA had violated its duty to fairly represent all members of the bargaining unit. In particular, we pointed to the fact that “ALPA failed to follow its own merger policy for mergers with ALPA-represented groups. This policy would have required ALPA to conduct internal negotiations with Jet America pilots, and mediate and arbitrate if necessary, before presenting its position to management.” Id. at 216. Effectively, ALPA “discriminate[d] against the Jet America pilots because they were not unionized prior to the merger.” Id. at 217.
In the end, applying these principles here, we do not think that this is a difficult case. From its inception, USAPA has advocated for date-of-hire principles as a way of suppressing the minority, the West Pilots. In another context, a date-of-hire preference would be a perfectly rational means of ordering a seniority list, see McNamara-Blad v. Ass’n of Prof'l Flight Attendants, 275 F.3d 1165, 1172 (9th Cir.2002); Laturner v. Burlington N., Inc., 501 F.2d 593, 599 (9th Cir.1974), but here it was a raw exercise of political power to undo the process to which the East and West Pilots had agreed. In effect, USAPA promised a date-of-hire regime as the quid pro quo for securing the East Pilots’ vote on their new bargaining *986 unit, and it treated the West Pilots as though they were non-union members.
Under the Transition Agreement’s seniority-integration process, the two groups of pilots were committed to working out a single, integrated seniority list through ALPA’s Merger Policy. That Merger Policy provided a familiar, neutral set of rules for resolving such explosive issues. Even though neither side knew what the outcome of the game would be, both sides knew what the rules were. Both East and West Pilots had a full and fair opportunity to advocate for the advantages of their favored seniority regime. Negotiation, mediation, arbitration — all well-established dispute-resolution mechanisms — were brought to bear in the East and West Pilots’ seniority dispute. In the end, neither side could agree on a method for integrating the two lists, and the matter went to arbitration. The result was the Nicolau Award, which did not embrace in full the position of either side. ALPA was obligated to defend that Award in its collective bargaining negotiations with US Airways.
Yet, when all was said and done, the East Pilots repudiated their promise to be bound by the outcome of the agreed-upon process. When the East Pilots did not get the outcome they wanted, they simply dumped the rules and found a new rule-maker — USAPA—that they could control. By “constitutionally committing USAPA] to pursuing date-of-hire principles,” Addington I, 606 F.3d at 1177, the East Pilots fixed the game.
From the outset, USAPA was irreconcilably opposed to the negotiating position of the West Pilots. Conceived in the minds of the East Pilots, elected and installed by the East Pilots, and constitutionally committed to a date-of-hire list that favored the East Pilots, USAPA could never fairly and impartially represent the West Pilots. The very reason for its existence was to undermine the Nicolau Award in every manner that ALPA had refused to do. USAPA was, for all intents and purposes, a representative for the East Pilots. This purpose is nowhere more evident than in the East Pilots’ and USAPA’s own words. In the East Pilots’ consultations with counsel, they sought to develop a roadmap for creating “a new bargaining agent [that] can get around the award and make the Nicolau Award moot.” And although counsel cautioned the East Pilots to take care not to advertise too broadly that the “sole reason for the new union” was to abrogate the Nicolau Award, the East Pilots paid little heed. Their new union’s constitution spoke its founders’ purpose loud and clear. USAPA’s constitution committed it “to maintain[ing] uniform principles of seniority based on date of hire.” This principle flatly contradicted the Nicolau Award, but it ensured that the East Pilots, whose voting strength overpowered the West Pilots by more than two-to-one, would vote to certify USAPA as the new collective bargaining representative. And upon its certification, USA-PA’s first act was to submit a new seniority list to US Airways, consistent with the date-of-hire principles it was constitutionally committed to proselytize.
Although in Addington I we were uncertain about how the East and West Pilots’ “internal disputes” would eventually “work themselves out,” 606 F.3d at 1181 n. 4, USAPA’s subsequent actions have rendered the picture clear. Since USAPA’s initial act of proposing a revised seniority list in 2008, it has continued to oppose any efforts to reach a “Single Agreement,” the consummation of which would automatically trigger the implementation of the Nico-lau Award under the terms of the Transition Agreement. Thus far, USAPA has been fully successful. Two years after we decided Addington I, when US Airways and American Airlines announced their *987 merger, there was still no Single Agreement and no Nicolau Award. USAPA succeeded in keeping separate the seniority lists applicable to the East and West Pilots until it finally had the opportunity, in the US Airways-American Airlines merger, to dismantle the Nicolau Award for good. In short, USAPA’s aim to benefit the East Pilots at the expense of the West Pilots is no longer in any doubt.
There is another, independent reason why USAPA’s genetic commitment to a date-of-hire principle violates its duty of fair representation. USAPA did not just follow ALPA in time; it succeeded to ALPA’s duties under the Transition Agreement. That union-management Transition Agreement provided that once ALPA’s Merger Policy resulted in an integrated list, the union was obligated to submit it to US Airways and to “use all reasonable means at its disposal to compel the company to accept and implement the merged seniority list.” As the district court found in the 2012 proceedings, “[w]hen USAPA became the pilots’ new collective bargaining representative, it succeeded ‘to the status of the former representative without alteration in the contract terms.’ ” US Airways, 2012 WL 5996936, at *4 (quoting Int'l Bhd. of Teamsters, 717 F.2d at 163). “Thus, just as ALPA would have been bound by the Transition Agreement had it remained the pilots’ representative, USAPA is bound by the Transition Agreement.” Id. The court observed that the Transition Agreement could still be modified by agreement of the union and US Airways, but it warned USAPA that if it abandoned the Nicolau Award it would be “on dangerous ground.” Id.
When the West Pilots brought this case to the district court, the court again assumed that USAPA had breached its duty of fair representation if it abandoned its “obligation” to the Nicolau Award without some “legitimate union purpose.” Id. at *5. The union claimed that Paragraph 10(h) of the MOU satisfied that purpose, and the district court reluctantly agreed. We thus turn to Paragraph 10(h) of the MOU.
2. Paragraph 10(h) did not serve a legitimate union purpose
The merger with American Airlines presented USAPA with a dilemma. On the one hand, it offered USAPA an opportunity to obtain a host of lucrative benefits for all its pilots through its negotiation of the MOU. On the other hand, the MOU threatened to become the “Single Agreement” that USAPA had fought for years to avoid. Ultimately, USAPA agreed to the MOU, but not without inserting a provision making clear that its assent to the MOU would not “provide a basis for changing the seniority lists currently in effect at US Airways.” Paragraph 10(h) therefore maintained in-place the separate seniority lists for the East and West Pilots that persisted at US Airways. The West Pilots contend that USA-PA breached its duty of fair representation when it included Paragraph 10(h) in the MOU. As the plaintiffs, the West Pilots bear the burden to demonstrate “substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives.” Beck, 506 F.3d at 880 (internal quotation marks omitted). For the reasons discussed below, we conclude that the West Pilots have met their burden and that Paragraph 10(h) of the MOU represents yet another example of USAPA’s continuing discrimination against the West Pilots.
Here, the district court identified three reasons why USAPA may have included Paragraph 10(h) in the MOU. First, the district court found, USAPA used Paragraph 10(h) to make the MOU “explicitly neutral” and “put[ ] off to another day the *988 question of the appropriate seniority regime,” while securing, in exchange, “the additional compensation contained in the MOU.” Second, the court suggested that USAPA viewed Paragraph 10(h) as “necessary to prevent the drag-out fight that surely would have accompanied any non-neutral, seniority-related provision.” And finally, the district court found that USA-PA likely believed that Paragraph 10(h) was necessary to prevent completion of a “Single Agreement,” triggering implementation of the Nicolau Award. We address each finding in turn.
First, we address the district court’s conclusion that USAPA’s motive for including Paragraph 10(h) was to render the MOU “explicitly neutral” so as to secure the benefits contained in the MOU. Had there been any evidence to suggest that USAPA included Paragraph 10(h) for the purpose of obtaining benefits under the agreement, then USAPA’s actions would clearly be legitimate. See Baker, 628 F.2d at 166. Certainly, obtaining salary increases, retirement benefits, and pension benefits is as legitimate a purpose as obtaining greater job security. See id. The problem, however, is that the district court did not point to a single piece of evidence supporting its conclusion. Whereas the record in Baker clearly showed that a particular seniority regime was a “major bargaining goal” for the company as it was necessary to keep the company afloat, see id. at 159, the district court below pointed to no evidence suggesting that the airline insisted on Paragraph 10(h) in exchange for the benefits it was offering.
Moreover, there is no apparent reason why the airlines would value this asserted concession. While seniority holds enormous consequence to individual pilots, the record fails to show that New American has any interest in whether one pilot is senior to another, or vice versa. It is no surprise, then, that although US Airways and American wished to integrate then-respective pilots in accordance with the new McCaskill-Bond Amendment, as required by law, there is no evidence that the airlines had any stake in the substantive outcome of the seniority integration. Here, there is no rational justification in the record to support the conclusion that USAPA decided to put off the seniority discussion to garner benefits for the pilots under the MOU.[8] Because we are left with “a definite and firm conviction that a mistake has been made,” we conclude that the district court’s contrary finding is clearly erroneous. See Woods, 925 F.2d at 1199 (internal quotation marks omitted).
Second, the district court concluded that Paragraph 10(h) may have been inserted into the MOU to prevent a “drag-out fight that surely would have accompanied” any provision purporting to affect seniority. This conclusion is unsupportable. It may be perfectly legitimate, in the abstract, for a union to take measures to avoid infighting while negotiating a contract with an employer. But conflict avoidance cannot serve as a legitimate union purpose where the conflict results from the unilateral,- discriminatory action of the union itself. In other words, the union cannot claim that it is avoiding intra-union conflict by negotiating a position that clearly favors one side in the intra-union dispute. That is not conflict avoidance; it is using the negotiations as an excuse for conflict resolution. As we explained above, USAPA was constitutionally committed to repudiating the *989 Nicolau Award and thus diametrically opposed to the interests of its West Pilot members. Thus, accepting the avoidance of the fight between USAPA and the West Pilots as a legitimate purpose for including Paragraph 10(h) merely blesses USAPA’s discriminatory conduct against the West Pilots. USAPA may not point to a conflict of its own, unjustified creation to bootstrap its way to a legitimate union purpose.[9]
Having set aside two of the district court’s proposed motives for implementing Paragraph 10(h), we are left with the court’s final set of findings. The district court found that USAPA likely included Paragraph 10(h) to ensure that the Nicolau Award never took effect. This conclusion finds ample support in the record.[10] But we respectfully disagree with the district court and the dissent regarding the inference to be drawn from this fact. Far from demonstrating that the union had a legitimate purpose in negotiating Paragraph 10(h), the paragraph is further evidence of USAPA’s intransigence and its continuous course of discriminatory conduct. USA-PA’s motive is nowhere more evident than in its behavior during the MOU roadshows where, as the district court found, USA-PA’s representatives told the East Pilots that Paragraph 10(h) rendered the Nicolau Award “dead,” but also “played fast-and-loose” with the West Pilots, deceiving them about the purpose-and effect of Paragraph 10(h).[11] USAPA included Paragraph 10(h) solely to benefit the East Pilots over the West Pilots, to free them from the consequences of the arbitration to which they were bound. USAPA’s conduct is blatantly discriminatory. Such a decision falls outside the “wide range of reasonableness” that we afford the union because USAPA has violated its duty of “complete loyalty to[] the interests of all *990 whom it represents.” Ford Motor Co., 345 U.S. at 338, 73 S.Ct. 681; see Barton Brands, 529 F.2d at 798-99.
In sum, the district court identified three possible reasons why USAPA included Paragraph 10(h) in the MOU: first, to obtain the benefits of the MOU while remaining neutral as to seniority; second, to avoid conflict; and third, to advantage the East Pilots by promoting date-of-hire seniority over the Nicolau Award. The first reason is unsupported by the evidence, and the district court clearly erred in concluding that this reason could have supported USAPA’s actions. The second reason is not legitimate; USAPA may not rely upon an unjustified conflict of its own making as a legitimate union purpose. And the third reason is clearly discriminatory and impermissible. None of the purposes that the district court identified for USAPA’s actions constitutes a “legitimate union purpose” for abandoning the Nicolau Award in the MOU. Nor do we see any other legitimate union purpose for Paragraph 10(h).
Our disagreement with the district court is not fundamental, however, but merely marginal. The district court acknowledged that this case presented a “very close call” and that USAPA avoided liability only by the “slimmest of margins.” Ad-dington, 2014 WL 321349, at *5, *12. We conclude that once USAPA assumed the duty to act as statutory representative for all the pilots, it could not rightly refuse to represent all the pilots’ interests fairly and impartially. Because it did so openly, we find that USAPA violated the most elementary principle of the duty of fair representation — to serve the interests of all of its members, not just the pilots who voted for the union.
IV. REMEDY
In Steele, the Supreme Court explained that a “representative which ... discriminates [among members] may be enjoined from so doing.” 323 U.S. at 203, 65 S.Ct. 226. Thus, in duty of fair representation cases, we can fashion an injunction where it will either prevent the unjustly benefited employee from “taking the benefit of such discriminatory action,” see id., or “make the injured employee whole,” see Int’l Bhd. of Elec. Workers v. Foust, 442 U.S. 42, 49, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979) (citing Steele, 323 U.S. at 206-07, 65 S.Ct. 226). In crafting equitable relief for the West Pilots, our task is to determine how the parties would have fared but for USAPA’s breach.
Because APA has taken its place as the exclusive bargaining representative for all the pilots who will become part of New American Airlines, USAPA no longer maintains its former position. In an ordinary ease, that would mean the end of USAPA’s representative authority. See McNamara-Blad, 275 F.3d at 1170 (“[A] labor organization that is not the exclusive representative of a bargaining unit v . owes no duty of fair representation to the members of the unit.” (internal quotation marks omitted)). In this case, however, APA authorized USAPA to participate in the upcoming SLI arbitration under APA’s discretionary authority as the designated collective bargaining representative. Likely recognizing that USAPA represents only the interests of the East Pilots, APA sought and obtaified permission from the Preliminary Arbitration Board to designate a separate West Pilots Merger Committee to represent the interests of the West Pilots. Thus, even though USAPA no longer enjoys the statutory status of the exclusive bargaining representative, USAPA continues to have a place at the bargaining table where it may formally oppose the West Pilots Merger Committee and advocate for its favored seniority regime.
*991 The harm resulting from USAPA’s violation is the persisting absence of an integrated seniority list. Permitting USAPA to go forward in the SLI arbitration process effectively ratifies USAPA’s past violations of its duty of fair representation. It allows USAPA to take advantage of the absence of an integrated list — the direct result of its own misconduct — to advocate a brand new list unfettered by its obligations under the ALPA Merger Policy and Transition Agreement. We cannot countenance such a result. Nevertheless, we also recognize that it is not certain whether the Nicolau Award would have been implemented fully but for USAPA’s breach. Because a good faith attempt to implement the Nicolau Award would have ultimately required a ratification vote by all the pilots, and we cannot know what the results of such a vote would have been, we can never be certain whether efforts to implement the Nicolau Award through a collective bargaining agreement with US Airways would have succeeded. See Addington I, 606 F.3d at 1179.
We conclude that injunctive relief is necessary and appropriate in this case to prevent the East Pilots from continuing to enjoy the benefits of USAPA’s breach at the expense of the West Pilots. Although there remains some ambiguity over whether the Nicolau Award would have been adopted in toto, to conclude, as does the dissent, that the West Pilots may not obtain any relief at all is to grant USAPA the benefit of doubt that USAPA itself created. We thus remand this case with instructions to the district court to enter an order enjoining USAPA from participating in the McCaskill-Bond seniority integration proceedings, including any seniority-related discussions leading up to those proceedings, except to the extent that USAPA advocates the Nicolau Award.[12] See Bernard, 873 F.2d at 217-18 (affirming preliminary injunction compelling a union to negotiate a new integrated seniority agreement in accordance with its own internal procedures). This remedy adequately accounts for our uncertainty over whether the Nicolau Award would have been implemented because it allows for the possibility that the SLI arbitration panel might not ultimately use the Nicolau Award in its final integration of the US Airways and American Airlines Pilots. It also limits USAPA’s participation in the seniority integration proceedings, but does not prohibit USAPA from advocating the seniority position of the East and West Pilots, collectively, as against the American Airlines pilots. Nor is USAPA barred from participating, to the extent it is otherwise permitted, in negotiations regarding other labor matters. At the same time, our injunction has the benefit of alleviating the West Pilots’ hardship of fighting on two fronts and ensuring that the East Pilots cannot exploit the benefits of USAPA’s breach any longer.
V. CONCLUSION
Since Steele, “the duty of fair representation has stood as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law.” Vaca, 386 U.S. at 182, 87 S.Ct. 903. USAPA has served as the stalking horse for the East Pilots’ exclusive interests and left the West Pilots bereft of representation. USAPA’s manifest disregard for the interests of the *992 West Pilots and its discriminatory conduct towards them constitutes a clear breach of duty. Accordingly, we reverse the district court’s conclusion that USAPA did not breach its duty of fair representation and remand with instructions to enjoin USAPA from participating in the McCaskill-Bond proceedings except to the extent that USAPA will advocate the Nicolau Award. On remand, the district court should consider the West Pilots’ claim for attorneys’ fees.
We vacate as moot the portion of the district court’s decision denying the Plaintiffs separate representation in the McCaskill-Bond proceedings, with instructions to dismiss. United States v. Munsingwear, Inc., 840 U.S. 86, 39, 71 S.Ct. 104, 95 L.Ed. 36 (1950); see Camreta v. Greene, 563 U.S. 692, 131 S.Ct. 2020, 2036 & n. 11, 179 L.Ed.2d 1118 (2011) (vacating only a portion of the lower court’s judgment). The Preliminary Arbitration Board’s order granted the West Pilots separate representation in the SLI arbitration.[13] Thus, the West Pilots have obtained the remedy they sought and “there is nothing for us to remedy, even if we were disposed to do so.” Spencer v. Kemna, 523 U.S. 1, 18, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).
Finally, we dismiss USAPA and US Airways’ cross-appeals for failure to present an argument. Fed. R.App. P. 28(a)(8). The judgment of the district court is
REVERSED in part, VACATED in part, and REMANDED. Costs on appeal are awarded to Plaintiffs-Appellants.

. We discuss the McCaskill-Bond Amendment infra note 5. That statutory process is similar to the process provided for in ALPA’s Merger Policy in that it calls for negotiation and, failing agreement, arbitration.

. Claim Two of the West Pilots’ complaint alleged that US Airways breached the Transition Agreement. The district court dismissed that claim on the ground that it lacked jurisdiction to hear the claim. Under the Railway Labor Act, federal courts lack subject matter jurisdiction over certain disputes "grounded in the [collective bargaining agreement].” See Konop v. Hawaiian Airlines, Inc., 302 F.3d 868, 881 (9th Cir.2002) (quoting Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 256, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994)). The West Pilots have not appealed the dismissal of this claim. Under Claim Three, the West Pilots sought attorneys’ fees under the common benefit doctrine. Finally, contemplating *977 the MOU’s Seniority Integration Process set to begin upon the completion of the bankruptcy proceedings involving American Airlines, the West Pilots sought an order under Claim Four declaring that they have "party status” in the integration process and "the right ... to participate fully (with counsel of their own choice)” in that process.

. The district court also rejected the West Pilots’ claimed right to separate representation at the upcoming McCaskill-Bond Seniority List Integration ("SLI”) proceedings, concluding that McCaskill-Bond contemplates only that the certified bargaining representative participate in seniority integration proceedings. Addington, 2014 WL 321349, at *8-12. As we discuss in the following section, the West Pilots were ultimately offered a seat at the table by APA.

. Recall that the APA was the American Airlines' collective bargaining representative pri- or to the merger. It is no surprise that APA was elected; with nearly 10,000 pilots, APA represents a much larger group of pilots than the East and West Pilots combined.

. The McCaskill-Bond Amendment codified two of the labor-protective provisions that the Civil Aeronautics Board imposed in a 1972 merger between Allegheny Airlines and Mohawk Airlines. 49 U.S.C. § 42112 Note; Allegheny-Mohawk Merger Case, 59 C.A.B. 19, 45 (1972). These two provisions, Sections 3 and 13, are also known as the "Allegheny-Mohawk LPPs.”
Section 3 provides that employees involved in a merger of airlines will have their separate seniority lists combined into a single seniority list covering all employees in a "fair and equitable manner.” It further provides that if the parties cannot agree on a fair and equitable manner for combination of the seniority lists, any party may submit the dispute for resolution in accordance with the dispute resolution procedures of Section 13.
Section 13(a) of the Allegheny-Mohawk LPPs establishes a resolution procedure for seniority integration disputes. If a dispute arises, and the parties have not settled the dispute within 20 days, Section 13 provides for a default process for selecting arbitrators and a 90-day timeline for resolving the dispute. Subsection (b) states that the parties may agree on an alternative method for dispute settlement or arbitrator selection, but no party is excused from compliance with the default procedure unless all the parties agree on an alternative.

.We take judicial notice of US Airways’ 28(j) Letter filed on February 26, 2015, and its *979 accompanying exhibits, the Seniority Integration Protocol Agreement and the January 9, 2015 Preliminary Arbitration Board Award. See Harris v. Cnty. of Orange, 682 F.3d 1126, 1131-32 (9th Cir.2012) (“We may take judicial notice of undisputed matters of public record, including documents on file in federal or state courts.” (citation omitted)).

. Having turned the West Pilots away once before in Addington I, the dissent would have *982 us bar the door to them entirely. The dissent contends that this appeal is moot because the West Pilots’ complaint requested an injunction "requiring Defendants to conduct seniority integration ... using the seniority order in the Nicolau Award,” but USAPA is no longer the exclusive bargaining representative for the US Airways pilots. See Dissent at 992-94. Though the merger has stripped USAPA of the legal status it once possessed, such that USAPA cannot violate any duty of fair representation in the future, it did not wipe away any harms that USAPA wrought to the West Pilots in the past. Nor does the change in USAPA’s status prevent us from granting meaningful injunctive relief to the West Pilots in this case; USAPA continues to enjoy the right to participate in the upcoming SLI arbitration. See United States v. AMC Entm't, Inc., 549 F.3d 760, 768 (9th Cir.2008) (courts enjoy "considerable discretion in granting in-junctive relief and in tailoring ... relief”). We thus decline to place the West Pilots in the dissent’s catch-22: having once rebuffed as unripe the West Pilots’ plea to redress USA-PA’s discriminatory treatment, we will not now deprive them of federal review yet again on the grounds that their claim is, moot.

. USAPA’s view — that the mere presence of contractual benefits suffices to discharge a union’s duty of fair representation — would permit .unions to insulate any discriminatory action by embedding it within a contract which nominally provides benefits, even if there is no rational connection between the benefits and the discriminatory action. Such a rule proves too much.

. The dissent contends that "[ejven if USAPA had some role in perpetuating the seniority controversy by not resolving it sooner,” we must focus our attention on the facts and circumstances confronting USAPA at the time it decided to include Paragraph 10(h) in the MOU, which included the "very real conflict that existed at the time the MOU was being negotiated.” Dissent at 997. The dissent's narrow view of the scope of our review threatens to eliminate meaningful judicial review entirely. The history and context of a union’s actions is critical to understanding its motives. Contrary to the dissent’s view that Paragraph 10(h) was neutral, reflecting USA-PA’s "decision to walk a middle road,” Dissent at 996-97, we conclude that the history of this case makes clear that it was anything but.

. The record showed that Mr. Szymanski “was motivated in large part simply by a desire to ensure the Nicolau Award never take effect” and that USAPA believed that Paragraph 10(h) was necessary to prevent the MOU from "trigger[ing] obligations under the Transition Agreement, including implementation of the Nicolau Award.” Addington, 2014 WL 321349, at *2-3.
In its final order, the district court took USAPA to task for its dilatory tactics: "USA-PA employed almost every conceivable delaying tactic,” including extensive filings and motions to continue. Id. at *5. Delay worked to USAPA’s benefit. The longer it could postpone its obligations to negotiate for the Nico-lau Award, the more likely it was that the West Pilots would give in or that the matter would become moot.

.We could not agree more with the dissent that reversal of the district court’s factual determinations requires a finding of clear error. But far from "ignor[ing]” evidence that the majority of the West Pilots voted to ratify the MOU, which the dissent contends we have done, see Dissent at 998 n. 5, we have clearly acknowledged it. See supra Part II.A. Rather, it is the dissent that draws an inference from the facts that the district court did not; while the dissent contends that "the fact that West Pilots overwhelmingly ratified the MOU suggests that USAPA was not simply abandoning their interests,” Dissent at 997, the district court found that the West Pilots voted in favor of the MOU because, "[i]n general, the West Pilots accepted USAPA's oral and written representations that the MOU was neutral.” See Addington, 2014 WL 321349, at *3.

. We decline to order the issuance of the West Pilots' requested injunction "that an unmodified Nicolau Award must be used to order the seniority of the East and West pilots in the pending McCaskill-Bond process.” Although we have approved injunctions against nonparties, see SEC v. Wencke, 622 F.2d 1363, 1370(9th Cir.1980), we decline to do so here, where USAPA is a party to this suit and enjoining it alone will provide effective relief to the West Pilots.

. USAPA contends that Plaintiffs’ own conduct rendered this claim moot, making vaca-tur inappropriate in this case. To the contrary, the Preliminary Arbitration Board granted the West Pilots relief, thus rendering the West Pilots’ claim moot "due to circumstances unattributable to any of the parties.” U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship, 513 U.S. 18, 22-26, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994) (quoting Karcher v. May, 484 U.S. 72, 82, 83, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987)). Vacatur is appropriate under such circumstances.