FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BRUCE BECKINGTON; JOHN JURIK; JAMES VAN SICKLE, *Plaintiffs-Appellants*, <br><br> v. <br><br> AMERICAN AIRLINES, INC., *Defendant-Appellee.* | No. 18-15648 <br><br> D.C. No. 2:17-cv-00328-JJT <br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
John Joseph Tuchi, District Judge, Presiding

Argued and Submitted March 27, 2019
San Francisco, California

Filed June 10, 2019

Before: A. Wallace Tashima, Susan P. Graber,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

## SUMMARY[*]

### Labor Law

The panel affirmed the district court's dismissal for failure to state a claim of an action brought by airline pilots, seeking damages under the Railway Labor Act against their employer for allegedly "colluding" with a union in the union's breach of its duty of fair representation.

In 2005, US Airways and America West Airlines merged to form a single carrier, which kept the name US Airways. The Air Line Pilots Association represented both the US Airways Pilots (the "East Pilots") and the America West pilots (the "West Pilots"). The East Pilots and the West Pilots engaged in a seniority dispute that went to arbitration. The East Pilots formed a new union, the US Airline Pilots Association ("USAPA"), which became the bargaining representative for all the pilots. In *Addington I*, a group of West Pilots alleged that USAPA breached its duty of fair representation by failing to pursue implementation of the arbitration award, known as the "Nicolau Award." In *Addington II*, US Airways sued USAPA and the West Pilots, seeking declaratory relief. In anticipation of a merger between US Airways and American Airlines, the two airlines, USAPA, and the union for American's pilots negotiated a memorandum of understanding ("MOU") addressing pilot seniority. In *Addington III*, a group of West Pilots alleged that USAPA breached its duty of fair representation by including in the MOU Paragraph 10(h), which abandoned the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Nicolau Award.  The court of appeals reversed the district court's judgment after trial in part, holding that USAPA breached its duty of fair representation by inserting Paragraph 10(h) into the MOU.  In arbitration pursuant to the MOU, the arbitration panel issued a decision declining to implement the Nicolau Award and using a different methodology for integrating the pilots' seniority lists.

Former West Pilots filed *Addington IV*, seeking damages under the Railway Labor Act for US Airways's "collusion" in USAPA's breach of its duty of fair representation. Affirming the district court's dismissal, and disagreeing with the Seventh Circuit, the panel held that employees aggrieved by a union's breach of its duty of fair representation during collective bargaining cannot sue their employer for "colluding" in the union's breach.  The panel concluded that nothing in the Railway Labor Act's text or collective bargaining framework supported expansion of the doctrine that a union owes its constituents a duty of fair representation. The panel held that the pilots' suit was different from a hybrid suit, in which employees sue both their employer and their union, because the pilots made no allegation that their employer breached its own obligations under a collective bargaining agreement.

**COUNSEL**

Marty Harper (argued) and Andrew S. Jacob, ASU Alumni Law Group, Phoenix, Arizona, for Plaintiffs-Appellants.

Robert A. Siegel (argued) and Chris A. Hollinger, O'Melveny & Myers LLP, Los Angeles, California; Paul D. Jones, American Airlines Inc., Forth Worth, Texas; for Defendant-Appellee.

**OPINION**

BYBEE, Circuit Judge:

The Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.*, authorizes employees in the railroad and airline industries to select a union to act as their exclusive representative for collective bargaining with their employer. As exclusive bargaining representative, the union assumes a duty to "represent fairly the interests of all bargaining-unit members during the negotiation, administration, and enforcement of collective-bargaining agreements." *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 47 (1979). If the union breaches its duty of fair representation, aggrieved employees have a cause of action against the union that is "judicially 'implied'" under the RLA. *Id.* (citation omitted). The question in this case is whether those employees may also sue their employer under the RLA for allegedly "colluding" with the union in the union's breach of duty. We conclude that the answer is no.

I

A

We begin with some background on the RLA, which "cannot be appreciated apart from the environment out of which it came and the purposes which it was designed to serve." *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 444 (1987) (quoting *Elgin, Joliet & E. Ry. Co. v. Burley*, 325 U.S. 711, 751 (1945) (Frankfurter, J., dissenting)).

Enacted in 1926, the RLA followed "decades of labor unrest" in the railroad industry that threatened "wasteful strikes and interruptions of interstate commerce." *Id.* at 444, 450 (citation omitted). Disputes over wages and working conditions led to boycotts and strikes capable of shutting down large swaths of the nation's railways. *See* Charles M. Rehmus, *Evolution of Legislation Affecting Collective Bargaining in the Railroad and Airline Industries*, in *The Railway Labor Act at Fifty* 1, 2–7 (Charles M. Rehmus ed., 1977). States were largely unable to regulate rail lines that extended beyond their borders, *see Wabash, St. Louis & Pac. Ry. Co. v. Illinois*, 118 U.S. 557, 577 (1886), and Congress's prior efforts at prescribing various dispute resolution mechanisms were unsuccessful, *see Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 755–57 & nn.11–12 (1961). The strikes in many cases turned into violent riots, which often led to sweeping strike injunctions and, in some cases, intervention by federal troops. Wayne L. McNaughton & Joseph Lazar, *Industrial Relations and the Government* 33, 95–109 (1954); *see, e.g.*, *In re Debs*, 158 U.S. 564, 582–83 (1895); *King v. Ohio & Miss. Ry. Co.*, 14 F. Cas. 539, 540–42 (C.C.D. Ind. 1877) (No. 7,800); *United States v. Ry. Emps.'*

*Dep't of Am. Fed'n of Labor*, 283 F. 479, 492–96 (N.D. Ill. 1922).

By 1926, the major railroads and railroad unions recognized the need for a peaceful and effective framework for resolving labor disputes, and after a remarkable series of conferences and negotiations between them, both sides agreed on a bill that Congress enacted into law. Railway Labor Act, Pub. L. No. 69-257, 44 Stat. 577 (1926); *see Tex. & New Orleans R.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 562–63 & n.2 (1930). Congress substantially amended the RLA in 1934, *see Street*, 367 U.S. at 759–60, and in 1936 extended its "benefits and obligations" to the "then small-but-growing air transportation industry," *Int'l Ass'n of Machinists v. Cent. Airlines, Inc.*, 372 U.S. 682, 685 (1963); *see* 45 U.S.C. §§ 181–188.

The RLA endeavors "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). At "[t]he heart" of its framework is 45 U.S.C. § 152, First, which requires labor and management "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377–78 (1969) (alteration in original) (quoting 45 U.S.C. § 152, First). To that end, the RLA subjects all labor-management "disputes to virtually endless 'negotiation, mediation, voluntary arbitration, and conciliation,'" *Burlington N.*, 481 U.S. at 444 (citation omitted), with the precise procedure dependent on the nature

of the underlying claims, *see Alaska Airlines Inc. v. Schurke*, 898 F.3d 904, 916–17 (9th Cir. 2018) (en banc), *cert. denied*, 139 S. Ct. 1445 (2019). And to implement this framework, the RLA prescribes a process of collective bargaining "between the carriers on the one hand and the employees through their unions on the other." *Street*, 367 U.S. at 760 (citation omitted).

Accordingly, a fundamental component of the RLA's design is the right of employees "to organize and bargain collectively through representatives of their own choosing." 45 U.S.C. § 152, Fourth. Employers must "treat with" the employees' designated bargaining representative,[1] *id.* § 152, Ninth, which is chosen by a majority of the employees in a particular "craft" or bargaining unit, *id.* § 152, Fourth. Employers are prohibited from "interfer[ing] in any way with the organization of [their] employees"; using employer funds to "maintain[] or assist[] or contribut[e] to any labor organization [or] labor representative"; and influencing the "designation of representatives." *Id.* § 152, Third, Fourth. In certain circumstances, employees can sue their employer for violating these statutory commands. *See, e.g.*, *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 548–49 (1937) (refusing to bargain with designated union); *Ass'n of Flight Attendants v. Horizon Air Indus., Inc.*, 280 F.3d 901, 904–06 (9th Cir. 2002) (interfering with right to organize); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1015–16 (9th Cir. 1990) (per curiam) (providing financial assistance to

---

[1] "The term 'representative' means any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them." 45 U.S.C. § 151, Sixth. We use the terms "representative" and "union" interchangeably in this opinion.

union).   And "willful" violations can result in criminal sanctions.  45 U.S.C. § 152, Tenth.

Once a union is chosen by a majority of the employees in a bargaining unit, the union's bargaining power is "exclusive." *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 194 (1944).  The union "act[s] on behalf of *all* the employees" within its bargaining unit, a position that "operates to exclude any other from representing" the employees and prohibits employees from "bargain[ing] individually on behalf of themselves as to matters which are properly the subject of collective bargaining." *Id.* at 199–200 (emphasis added).   The union's exclusivity, moreover, imposes on the employer an "affirmative duty to treat *only* with the [selected union], and hence the negative duty to treat with no other." *Virginian Ry.*, 300 U.S. at 548 (emphasis added).   Thus, by "empower[ing] unions to bargain exclusively for all employees in a particular bargaining unit," the RLA "subordinate[s] individual [employee] interests to the interests of the unit as a whole." *Foust*, 442 U.S. at 46.

Of course, with great power comes great responsibility. Although the union is selected by a majority vote, the Supreme Court has held that, once selected, the union's authority as exclusive bargaining representative carries with it "a correlative duty 'inseparable from the power of representation'" to "represent fairly the interests of *all* bargaining-unit members during the negotiation, administration, and enforcement of collective-bargaining agreements." *Id.* at 46–47 (emphasis added) (quoting *Steele*, 323 U.S. at 204).  The duty of fair representation thus acts "as a 'bulwark to prevent arbitrary union conduct'" against individual employees, *id.* at 47 (quoting *Vaca v. Sipes*, 386 U.S. 171, 182 (1967)), who otherwise would have "no

means of protecting their interests" at the bargaining table other than to strike, a result the RLA was specifically designed to avoid, *Steele*, 323 U.S. at 200–01. To fulfill its duty of fair representation, the union is required "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 76 (1991) (quoting *Vaca*, 386 U.S. at 177). A union therefore "breaches its duty of fair representation if its actions are either 'arbitrary, discriminatory, or in bad faith.'" *Id.* at 67 (quoting *Vaca*, 386 U.S. at 190); *see Demetris v. Transp. Workers Union of Am.*, 862 F.3d 799, 805–08 (9th Cir. 2017).

The Supreme Court has also held that employees have a "judicially 'implied'" cause of action under the RLA against their union for breaching its duty of fair representation. *Foust*, 442 U.S. at 47 (quoting *Steele*, 323 U.S. at 204). "[R]esort to the courts" is necessary in such circumstances, the Court has explained, because the RLA does not contain any administrative mechanism for aggrieved employees to remedy the breach or "secure separate representation for the purposes of collective bargaining"; without a cause of action against the union, the right to fair representation "would be sacrificed or obliterated." *Steele*, 323 U.S. at 206–07. Thus, employees can sue the union in federal court and seek "the usual judicial remedies of injunction and award of damages when appropriate." *Id.* at 207.

B

We now turn to the facts of this case—the latest chapter in "what we have called 'a bitter seniority dispute'" between two factions of airline pilots. *Addington v. US Airline Pilots*

*Ass'n*, 791 F.3d 967, 971 (9th Cir. 2015) ("*Addington III*") (quoting *Addington v. US Airline Pilots Ass'n*, 606 F.3d 1174, 1176 (9th Cir. 2010) ("*Addington I*")); *see also US Airways, Inc. v. Addington*, 2012 WL 5996936, at *1–3 (D. Ariz. Oct. 11, 2012) ("*Addington II*"). We detailed the lengthy history of this dispute in our prior opinions, *see Addington III*, 791 F.3d at 971–79; *Addington I*, 606 F.3d at 1177–79, and only summarize it here.

1

In 2005, US Airways and America West Airlines merged to form a single carrier, which kept the name US Airways. At the time, the Air Line Pilots Association ("ALPA") was the certified bargaining representative for both the US Airways pilots (the "East Pilots") and the America West pilots (the "West Pilots"). The East Pilots significantly outnumbered the West Pilots.

ALPA entered into a "Transition Agreement" with the merging airlines that set forth the process for integrating the pilot seniority lists for the two pilot groups. The Transition Agreement required the pilots to negotiate among themselves a single integrated list and, if negotiations failed, to submit to binding arbitration. Once the two sides arrived at an integrated list, it would be presented to the airlines for acceptance. But the Transition Agreement also provided that, before a single seniority list could be implemented, the pilots and the airlines must ratify a new collective bargaining agreement—known as the "Single Agreement"—that would apply to all of the pilots. Ratification of the Single Agreement would require approval by a majority of both pilot groups. Until that condition was satisfied, the existing

seniority lists and collective bargaining agreements for the respective pilot groups would remain in place.

After the East and West Pilots tried but failed to negotiate a seniority list, ALPA arranged for arbitration before a panel led by George Nicolau. In May 2007, the arbitration panel issued a decision known as the "Nicolau Award," which composed an integrated seniority list that was generally viewed as more favorable to the West Pilots. The East Pilots objected to the Nicolau Award so strenuously that they created a new union—the US Airline Pilots Association ("USAPA")—and then used their numerical majority to replace ALPA with USAPA as the certified bargaining representative for all of the pilots. In subsequent negotiations with US Airways, USAPA ignored the Nicolau Award and pushed for a different integrated seniority list that favored the East Pilots.

In 2008, a group of West Pilots filed *Addington I*, an action against USAPA asserting that the union had breached its duty of fair representation by proposing a new seniority list instead of pursuing the implementation of the Nicolau Award.[2] 606 F.3d at 1178. The West Pilots prevailed in the district court, but we vacated the judgment on appeal after concluding that the breach-of-duty claim against USAPA would not be ripe until a Single Agreement had been ratified that implemented a seniority list other than the Nicolau Award. *Id.* at 1179–82.

---

[2] The West Pilots also brought breach-of-contract claims against US Airways, but those claims were dismissed for lack of jurisdiction. *See Addington I*, 606 F.3d at 1178.

Shortly thereafter, US Airways filed *Addington II*, a declaratory judgment action against both USAPA and the West Pilots. 2012 WL 5996936, at *1. In that lawsuit, US Airways sought guidance as to whether it could be liable for assisting in a breach of USAPA's duty of fair representation if it entered into a bargaining agreement that did not implement the Nicolau Award. *Id.* at *3. The district court concluded that it could not "provide as much guidance as it had hoped it could" because the matter would not be ripe until a Single Agreement was in place. *Id.* at *5. The court did, however, find that USAPA was bound by the Transition Agreement's requirement to pursue the arbitrated Nicolau Award and that USAPA's efforts to ignore it "place[d] USAPA on dangerous ground." *Id.* at *4.

2

In April 2012, US Airways began the process of a merger with American Airlines. At the time, US Airways was still operating with two pilot collective bargaining agreements and two pilot seniority lists.

In anticipation of the merger, the two airlines, USAPA, and the union for American's pilots negotiated a multi-party agreement called the "Memorandum of Understanding Regarding Contingent Collective Bargaining Agreement" ("MOU"). The MOU set forth procedures for reaching a Joint Collective Bargaining Agreement ("JCBA") that would apply to all pilots employed by post-merger American. It also addressed seniority integration for the pilots. The MOU required the pilots to negotiate a single merged seniority list

and, if negotiations failed, to submit to binding arbitration pursuant to the McCaskill-Bond Amendment.[3]

The MOU also provided the following in Paragraph 10(h): "US Airways agrees that neither this Memorandum nor the JCBA shall provide a basis for changing the seniority lists currently in effect at US Airways other than through the process set forth [under McCaskill-Bond]." This provision was inserted into the MOU by USAPA, and it had the effect of maintaining the separate seniority lists for the East and West Pilots by ensuring that neither the MOU itself nor the JCBA would become the "Single Agreement" for purposes of triggering the Nicolau Award. As USAPA put it, "under the MOU, the Nicolau Award was dead." *Addington III*, 791 F.3d at 976.

3

In March 2013, a group of West Pilots filed *Addington III*, a suit against USAPA and US Airways challenging the provenance of Paragraph 10(h). *See id.* The West Pilots alleged that USAPA breached its duty of fair representation by inserting Paragraph 10(h)—which impermissibly failed to "treat the Nicolau Award as final and binding"—without having a "legitimate union purpose" for doing so. *Id.* The West Pilots also claimed that US Airways breached the Transition Agreement by entering into the MOU. As remedies, the West Pilots sought (1) a declaratory judgment

---

[3] The McCaskill-Bond Amendment, 49 U.S.C. § 42112 Note, codified longstanding labor-protective provisions requiring that, during an airline merger, seniority lists must be combined in a "fair and equitable manner" through negotiation and arbitration. *See Addington III*, 791 F.3d at 978 n.5.

that USAPA violated the duty of fair representation by abandoning the Nicolau Award, (2) a declaratory judgment that US Airways breached the Transition Agreement, and (3) an injunction requiring the McCaskill-Bond panel to use the Nicolau Award to order the US Airways pilots.

After dismissing the breach-of-contract claim against US Airways on jurisdictional grounds, *id.* at 976 n.2, the district court "certified a class of approximately 1,600 West Pilots, held a two-day bench trial in October 2013, and issued a decision in January 2014," *id.* at 977. The court held that USAPA did not breach its duty of fair representation to the West Pilots after finding that USAPA had a legitimate union purpose for inserting Paragraph 10(h)—it prevented further argument about the use of the Nicolau Award. *Id.*

On appeal, we reversed the district court's conclusion with respect to the breach-of-duty claim against USAPA, holding that USAPA breached its duty of fair representation by inserting Paragraph 10(h) into the MOU, which "discriminat[ed] against the West Pilots" without a "legitimate union purpose" for doing so. *Id.* at 985–90. As we explained,

> when all was said and done, the East Pilots repudiated their promise to be bound by the outcome of the agreed-upon process. When the East Pilots did not get the outcome they wanted, they simply dumped the rules and found a new rulemaker—USAPA—that they could control. . . . [T]he East Pilots fixed the game.

*Id.* at 986. As a remedy, we declined to order an injunction compelling the McCaskill-Bond panel to use the Nicolau Award, as "we can never be certain whether efforts to implement the Nicolau Award through a collective bargaining agreement with US Airways would have succeeded." *Id.* at 991 & n.12. Instead, we allowed the McCaskill-Bond arbitration to proceed, but we directed the district court "to enter an order enjoining USAPA from participating in the McCaskill-Bond seniority integration proceedings . . . except to the extent USAPA advocates [for] the Nicolau Award." *Id.* at 991. Following our decision, USAPA withdrew from the McCaskill-Bond arbitration proceedings altogether, forcing the East Pilots to secure new representation during the arbitration.

The arbitration commenced in September 2015, and a year later, on September 6, 2016, the McCaskill-Bond panel issued a 60-page decision. Addressing the "elephant in the room" head on, the panel declined to implement the Nicolau Award. The panel explained that, although the Nicolau Award represented "an experienced arbitration panel's best judgment of a fair and equitable basis to integrate the seniority of the East and West pilot groups in 2007, . . . many of the relevant facts and circumstances and equities that must be weighed and balanced" had "changed, some dramatically," in the intervening decade. Given that "[t]he courts have uniformly declined to impose, enforce or direct implementation of the Nicolau Award," the panel was ultimately "not persuaded that updating and implementing the [Nicolau Award] is legally mandated, necessary, or appropriate, given the facts and circumstances extant on our

snapshot date of December 9, 2013."[4]     Instead of
implementing the Nicolau Award, the panel used a different
methodology that it believed would "provide[] the most
appropriate basis upon which to integrate the seniority of the
East and West Pilots."

C

In February 2017, plaintiffs—former West Pilots—filed
this suit against post-merger American seeking damages
under the Railway Labor Act for US Airways's "collusion"
in USAPA's breach of its duty of fair representation.[5]
According to plaintiffs' complaint, "[a] carrier shares liability
for a union's [duty-of-fair-representation] breach if it colludes
in that breach."  And in this case, they allege, "[American]
(then US Airways) colluded with USAPA to eliminate its
obligation to use the Nicolau List to integrate pilot
operations" in two ways: (1) by participating in "a meeting or
series of mostly attorneys-only meetings" during which
Paragraph 10(h) was drafted, and (2) by failing to evaluate
USAPA's proposal "to ensure that it is reasonable and
supported by a legitimate union purpose."

The district court granted American's motion to dismiss
under Federal Rule of Civil Procedure 12(b)(6). *Beckington
v. Am. Airlines Inc.*, 2018 WL 1400074 (D. Ariz. Mar. 20,
2018).  The court appeared to accept plaintiffs' premise that

---

[4] The "snapshot date" is the date that the McCaskill-Bond panel used
to assess the equities of the pilot groups.

[5] Plaintiffs apparently entered into a settlement agreement with
USAPA that waived their ability to seek damages from USAPA for its
breach of duty.

an employer can be held liable under the RLA for its "collusion" in a union's breach of duty. *Id.* at \*4 (citing *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1274, 1283 (7th Cir. 1985)). But the court dismissed plaintiffs' claim after concluding that they failed to adequately allege a "causal connection" between the union's breach of duty and the injuries alleged in this case; and failed to adequately allege "collusion," which the court defined as "bad faith, discrimination or hostility toward the plaintiff." *Id.* at \*5–6. Plaintiffs appealed, and we requested supplemental briefing on whether there is a basis—statutory or otherwise—for a standalone claim against an employer for "colluding" in a union's breach of its duty of fair representation.

## II

We review de novo the district court's grant of a motion to dismiss under Rule 12(b)(6) and may affirm on any ground supported by the record. *Ebner v. Fresh, Inc.*, 838 F.3d 958, 962 (9th Cir. 2016). To survive a motion to dismiss, the complaint must contain sufficient "well-pleaded, nonconclusory factual allegation[s]," accepted as true, to state "a plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009). Dismissal is appropriate when the complaint lacks a "cognizable legal theory" or sufficient factual allegations to "support a cognizable legal theory." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 652 (9th Cir. 2019) (citation omitted).

## III

Plaintiffs contend that an employee aggrieved by a union's breach of its duty of fair representation during

collective bargaining can sue not only the union but also the employer for "colluding" in the union's breach. Plaintiffs do not specify a legal source for their collusion theory of liability and instead invite us to "judicially create[]" one under the RLA. We decline the invitation, because plaintiffs' theory is fundamentally inconsistent with the complex relationship among employers, unions, and employees.

## A

The duty of fair representation owed by a union to its constituents, and the union's concomitant liability for breaching that duty, derives from the text of the RLA and its framework for collective bargaining. *See Steele*, 323 U.S. at 199–207. Nothing in the RLA's text or framework supports an expansion of that doctrine to impose liability on an employer solely for its "collusion" in a union's breach of duty.

To begin with, plaintiffs' collusion claim seeks to create liability for "acts not prohibited by the text of the statute." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (internal alterations omitted) (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994)). No provision of the RLA prohibits an employer from participating (whether "collusively" or otherwise) in a union's breach of duty to its members. The RLA does impose certain duties on employers—for example, requiring them to refrain from interfering with employees' freedom to self-organize and bargain collectively, *see* 45 U.S.C. § 152, Third, Fourth; and to "exert every reasonable effort to make and maintain" a collective bargaining agreement by "treat[ing] with" the designated union, *id.* § 152, First, Ninth—but plaintiffs do not contend that American (or US

Airways) violated any of those statutory duties.[6]  Their claim instead rests solely on US Airways's alleged participation in USAPA's breach of duty.  The text of the RLA, however, does not "explicitly require[]" employers to avoid this conduct, which "bodes ill" for plaintiffs' effort to premise liability on it.  *Cent. Bank*, 511 U.S. at 175 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254 (1993)).  We cannot extend liability under a statute beyond the scope of conduct "prohibited by the [statutory] text." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 n.2 (2005) (quoting *Cent. Bank*, 511 U.S. at 173); *cf. Steele*, 323 U.S. at 202–03 (relying on "the language of the [RLA]" to conclude that unions have a duty of fair representation).

Plaintiffs' collusion theory of liability also lacks support in the RLA's collective bargaining framework.  As outlined above, the RLA prescribes a process of collective bargaining "between the carriers on the one hand and the employees through their unions on the other." *Street*, 367 U.S. at 760 (citation omitted).  This process, like all collective bargaining, "is structured and regulated on the assumption that 'the parties . . . proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest.'" *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 394 (1982) (internal alteration omitted) (quoting *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 488 (1960)).  On one side of the bargaining table is the union, which has the "exclusive" right to represent individual employees and the "corresponding duty" to exercise that right fairly.  *Steele*,

---

[6] The employer must also comply with certain procedural requirements for collective bargaining, *see* 45 U.S.C. § 152, Sixth, Seventh, Eighth, Ninth; *id.* §§ 155–160, but those procedures are not at issue here.

323 U.S. at 194, 202. On the other side is the employer, which is "expected to represent its own interests, not those of the employees," *Am. Postal Workers Union, Local 6885 v. Am. Postal Workers Union*, 665 F.2d 1096, 1109 (D.C. Cir. 1981), and may in fact "prefer one group of employees over another," *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524, 1536 (7th Cir. 1992). Thus, for this process to work, the "employer [must] be able to rely on" the union to fulfill its "duty to discharge [its duty of fair representation] faithfully." *Bowen v. U.S. Postal Serv.*, 459 U.S. 212, 226 (1983).

Nothing about this framework suggests that the RLA imposes on employers an additional duty to bargain with the interests of particular employees in mind or to ensure that the union does so. At the bargaining table, the employer and the union must approach each other as respectful adversaries. Although they must find common ground, each comes to the table with an obligation to its own constituents—the union to its employee members and the employer to its investors. Expecting an employer to bargain simultaneously in favor of its own interests and in favor of the interests of some employees would force the employer into a game of chess against itself, pursuing what are often competing and inconsistent positions. And in doing so, the employer would also likely end up stepping on the union's own representative efforts. An employer has no duty to tell the union how to fulfill its duty to represent its constituents. And without a duty, there can be no liability. *See Cent. Bank*, 511 U.S. at 175.

This conclusion, moreover, does not change by invoking the word "collusion." Plaintiffs are presumably using that word in a colloquial sense, as it is not found anywhere in the RLA. When the word "collusion" is used in the context of

imposing liability for violating a federal statute, it generally acts as a synonym for "conspiracy"—i.e., an illegal agreement among two or more parties to violate some statutory duty owed by each party. *See, e.g.*, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 461–62 (1976) (using "collusion" in reference to a "conspiratorial manipulation" of a stock price in violation of the securities laws); *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984) (per curiam) (using "collusion" in reference to a conspiracy among competitors to restrain trade in violation of the antitrust laws). But a necessary predicate for imposing liability in these circumstances—the violation of a substantive legal duty—is missing here, because an employer owes no duty to individual employees during collective bargaining. Thus, whether an employer sits by as the union neglects some of its constituents, or actively encourages the union through some amorphous concept of "collusion," the employer's conduct does not violate any duty under the RLA and thus cannot provide the basis for liability.

To be sure, courts occasionally use the word "collusion" or similar language in the context of "hybrid" suits, in which employees sue both "their employer and their union, alleging that the employer breached a collective bargaining agreement and that the union breached its duty of fair representation." *Kelly v. Burlington N. R.R. Co.*, 896 F.2d 1194, 1195–96 (9th Cir. 1990); *see also DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164–65 (1983) (describing "hybrid" suits under the Labor Management Relations Act). Plaintiffs argue that their collusion claim against American is analogous to these hybrid cases.

Plaintiffs' reliance on these cases is misplaced, because the word "collusion" is being used in these cases not to create

a duty but instead to determine jurisdiction over the claim against the employer. Recall that, under the RLA, employees alleging that their employer breached a collective bargaining agreement must ordinarily submit to mandatory arbitration; "[f]ederal courts lack subject matter jurisdiction over [these] disputes." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 881 (9th Cir. 2002).[7] That remains true even if the employees also claim that their union has breached its duty of fair representation. *See Crusos v. United Transp. Union*, 786 F.2d 970, 972–73 (9th Cir. 1986). If, however, the employees allege that their employer and their union "acted 'in concert'" to discriminate against them, such that arbitration before a panel of employer and union representatives would be "absolutely futile," we have held that the employees can "circumvent the statutory administrative remedies" and join their breach-of-contract claim against the employer with their breach-of-duty claim against the union in federal court. *Bautista v. Pan Am. World Airlines, Inc.*, 828 F.2d 546, 551 (9th Cir. 1987) (quoting *Glover v. St. Louis–S.F. Ry. Co.*, 393 U.S. 324, 331 (1969)). And in describing the degree of concerted conduct necessary

---

[7] We need not—and do not—decide whether our prior characterization of the arbitration requirement as "jurisdictional" survives the Supreme Court's recent cases stressing the distinction between "jurisdictional" rules and "nonjurisdictional" claim-processing rules. *See, e.g.*, *Union Pac. R.R. Co. v. Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 81–82 (2009). Other circuits have divided on the resolution of that issue. *Compare Oakey v. U.S. Airways Pilots Disability Income Plan*, 723 F.3d 227, 237–38 (D.C. Cir. 2013) (holding that the arbitration requirement is jurisdictional), *with Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 789–90 (6th Cir. 2012) (holding that the arbitration requirement is not jurisdictional). But the distinction makes no difference here, because the arbitration requirement, however it is characterized, has no bearing on the substantive duties prescribed by the RLA.

to invoke this jurisdictional exception, we and other courts have sometimes used the term "collusion." *Croston v. Burlington N. R.R. Co.*, 999 F.2d 381, 387 (9th Cir. 1993), *abrogated on other grounds by Norris*, 512 U.S. 246; *accord Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 791 (6th Cir. 2012); *Raus v. Bhd. Ry. Carmen of U.S. & Can.*, 663 F.2d 791, 798 (8th Cir. 1981); *Richins v. S. Pac. Co. (Pac. Lines)*, 620 F.2d 761, 762 (10th Cir. 1980); *Goclowski v. Penn Cent. Transp. Co.*, 571 F.2d 747, 761 n.18 (3d Cir. 1977).[8]

Although plaintiffs in a hybrid suit may allege collusion as a basis for *jurisdiction*, collusion is not the basis for *liability*. A hybrid "suit, as a formal matter, comprises two causes of action"—one against the employer for "breach of the collective bargaining agreement," and one against the union for "breach of the union's duty of fair representation." *DelCostello*, 462 U.S. at 164. The two claims may be "inextricably interdependent," *id.*, but the "origin of the liability" for each claim is "separate and distinct," *Kaiser v. Local No. 83*, 577 F.2d 642, 645 (9th Cir. 1978); *see Czosek v. O'Mara*, 397 U.S. 25, 28–29 (1970). In other words, the ability to join claims in a hybrid suit for jurisdictional purposes does not create the "source of plaintiffs' rights" underlying those claims. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 577 (1979).

---

[8] The degree of concerted activity may also affect the apportionment of damages in a hybrid suit. *Cf. Czosek v. O'Mara*, 397 U.S. 25, 29–30 (1970) (declining to decide whether an employer and union may be jointly responsible for damages "when a single series of events gives rise to claims against the employer for breach of contract and against the union for breach of the duty of fair representation").

That dooms plaintiffs' analogy, because plaintiffs do not claim that American (or US Airways) breached its own obligations under a collective bargaining agreement. Instead, the only identifiable breach in this case is USAPA's breach of its duty of fair representation.   Without a breach by American of the collective bargaining agreement, we no longer have a hybrid suit but instead a pure breach-of-duty suit that seeks to hold American secondarily liable for USAPA's breach.  The RLA, however, contains no provision to support that theory of secondary liability, and we cannot invent one absent an "expression of congressional direction to do so." *Cent. Bank*, 511 U.S. at 183.

Finally, imposing liability on an employer in these circumstances could "frustrate the basic purposes underlying the duty of fair representation." *Foust*, 442 U.S. at 49 n.12 (quoting *Vaca*, 386 U.S. at 183).  Indeed, it may undermine the union's incentive to fulfill its duty of fair representation by allowing the union to escape liability for breaching it.  The union and the employee could, for example, "agree to a settlement pursuant to which the union would acknowledge a breach of its duty of fair representation in exchange for the employee's undertaking to look to his employer for his entire recovery," an unsavory and "unsound[]" result that the Supreme Court has rejected in similar circumstances. *Bowen*, 459 U.S. at 227 n.15.  And an employer, seeking to limit its exposure to liability for "collusion" with a union, may feel compelled to question or even subvert the union's representation of its members upon any suspicion that the union is breaching its duty. *See Vaca*, 386 U.S. at 191–92. Not only could this distrust have a "detrimental effect on labor-management relations," *Carroll v. Bhd. of R.R. Trainmen*, 417 F.2d 1025, 1028 (1st Cir. 1969), but it would also place employers in the untenable position of possibly

violating the RLA's anti-interference provisions, 45 U.S.C. § 152, Fourth; *see Ass'n of Flight Attendants v. Horizon Air Indus., Inc.*, 976 F.2d 541, 547 (9th Cir. 1992) (considering "evidence of [the employer's] attempt to undermine the union's bargaining status" in finding that the employer violated the RLA (internal alterations omitted)).

## B

Plaintiffs are not the first to assert a collusion theory of employer liability. In a handful of cases cited by plaintiffs, courts have suggested that an employer may be liable under the RLA for a union's breach of duty if the employer "acts in collusion with the union." *United*, 756 F.2d at 1283. We, however, have never adopted this theory of employer liability and are not persuaded to do so now.

At the front of this line appears to be the Seventh Circuit's decision in *United*. There, a group of pilots brought suit against both their union and their employer, United, alleging that the union "breached its duty of fair representation" and that "United was a party to that breach." *Id.* at 1281. After concluding that the pilots had failed to show that the union's conduct amounted to a breach of duty, the court turned to the pilots' claim that United was "a party to [the union's] breach." *Id.* at 1283. Of course, the court had just held that there was no breach by the union, which prompted the court to observe the "conceptual anomaly that would arise if [an employer] were held liable as a party where [the union], the principal, had been held not to have violated its duty." *Id.* Nevertheless, the court forged ahead, proclaiming that "[a]n employer is liable together with the union for the union's breach of its [duty of fair representation] if it acts in collusion with the union." *Id.*

(citing *Alvey v. Gen. Elec. Co.*, 622 F.2d 1279, 1290 (7th Cir. 1980)).  The court then proceeded to analyze the employees' "evidence supporting their assertion of collusion," only to find evidence of "negotiation" between United and the union, which it deemed insufficient.[9]  *Id.*

A few district courts have followed *United*'s lead, setting up the possibility of a freestanding collusion claim only to knock it down in the absence of "conduct that rises to the level of 'collusion.'"  *Am. Airlines Flow-Thru Pilots Coal. v. Allied Pilots Ass'n*, 2015 WL 9204282, at *2–3 (N.D. Cal. Dec. 17, 2015); *see In re AMR Corp.*, 2018 WL 2997104, at *26–27 (Bankr. S.D.N.Y. June 12, 2018); *Cunningham v. United Airlines, Inc.*, 2014 WL 441610, at *11 (N.D. Ill. Feb. 4, 2014); *Rakestraw v. United Airlines, Inc.*, 765 F. Supp. 474, 493–94 (N.D. Ill. 1991), *aff'd in part, rev'd in part*, 981 F.2d 1524; *see also Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361–62 & n.5 (D.C. Cir. 1999) (citing *United* as providing a possible "standard for determining whether an employer can be implicated in a union's breach of duty" but declining to adopt it).  A few other courts, also relying on *United*, have purported to recognize collusion claims but dismissed them because the union had not breached its duty. *See Flight Attendants in Reunion v. Am. Airlines, Inc.*, 813 F.3d 468, 475 (2d Cir. 2016); *Bishop v. Air Line Pilots Ass'n, Int'l*, 1998 WL 474076, at *18–19 (N.D. Cal. Aug. 4, 1998); *Caudle v. Pan Am. World Airways, Inc.*, 676 F. Supp. 314, 323 (D.D.C. 1987).

With respect, we are "convinced the parade is marching in the wrong direction."  *United States v. Smith*, 440 F.2d

---

[9] This conclusion was arguably an advisory opinion, as there was no breach by the union to which liability against United could attach.

521, 527 (7th Cir. 1971) (Stevens, J., dissenting). The core proposition in *United*—that, apart from any breach of contract, an employer is liable for a union's breach of duty "if it acts in collusion with the union," 756 F.2d at 1283—is unmoored from the RLA. The only authority cited by the Seventh Circuit to support this statement was a hybrid case that included a direct claim against an employer for "breach[ing] its collective bargaining agreements." *Alvey*, 622 F.2d at 1282. That case was inapposite; like the plaintiffs in this case, the employees in *United* did "not bring a direct claim against [their employer]." 756 F.2d at 1283. Indeed, the *United* court went out of its way to acknowledge that it did not have before it the "usual hybrid case" in which the breach-of-contract claim against the employer is "distinct from the [breach-of-duty] claim against the union." *Id.* That observation should have ended the discussion for the reasons we have explained—without a direct claim against the employer for breaching some contractual (or statutory) obligation, there is no basis for imposing liability on the employer.

Any doubt on this score can be dispelled by the inability of courts following *United* to come up with a coherent standard for identifying conduct that amounts to actionable collusion. The *United* court stated that an employer's mere "negotiation" with a union is insufficient, *id.*, but that is hardly a helpful benchmark, as employers are in fact *required* to negotiate with unions under the RLA, *see* 45 U.S.C. § 152, First, Second, Ninth. And although later courts have insisted on "something more" than negotiation, *Am. Airlines Flow-Thru Pilots*, 2015 WL 9204282, at *3, without a statutory mooring, any effort to divine what "more" is required quickly devolves into the sort of "free-wheeling judicial exercise[]" that we must avoid, *Jacksonville Terminal*, 394 U.S. at 383.

One court, for example, has suggested relying on "general principles" about "when it may be appropriate to hold one entity liable for another's breach of duty." *Am. Airlines Flow-Thru Pilots*, 2015 WL 9204282, at *3. But without a statutory hook, we—and more problematically, employers subject to the RLA and its penalties—would only be able to guess at what those "general principles" could be. Another court simply repurposed the standard used for identifying a breach of duty by a union, requiring a showing of "bad faith or discriminat[ion]" by the employer that reflects "hostility or contempt" toward the employees. *Rakestraw*, 765 F. Supp. at 493–94. Of course, an employer is not a union, and "the duties the RLA imposes on [one] cannot be imposed wholesale on [the other]." *Barthelemy*, 897 F.2d at 1007. Although an employer's discrimination or hostility toward individual employees during collective bargaining might in some circumstances violate an existing bargaining agreement or some other statute, nothing in the RLA supports what plaintiffs are trying to do here—transform a theory of union liability into a theory of employer liability.

IV

Under the RLA, employees can hold their union liable for breaching its duty of fair representation during collective bargaining. The RLA does not, however, support the imposition of liability on an employer solely for its "collusion" in the union's breach of duty. The district court's judgment dismissing plaintiffs' claim against American is **AFFIRMED**.